IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 24, 2007

Charles R. Fulbruge III
Clerk

Nos. 05-20604

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

DAVID KAY; DOUGLAS MURPHY

Defendants-Appellants

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:01-CR-914

Before HIGGINBOTHAM, BARKSDALE, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

David Kay and Douglas Murphy, executives at an American company that exported rice to Haiti in the 1990's, paid Haitian officials to reduce duties and taxes on their rice.  Kay disclosed this activity to the attorney for his employer, the SEC investigated, and Murphy and Kay were prosecuted for violating the Foreign Corrupt Practices Act ("FCPA" or "the Act").  The district court dismissed the indictment, concluding that the FCPA did not cover bribes to

reduce duties and taxes. We reversed the dismissal of the indictment and remanded to the district court, finding that no prior law clearly controlled the issue but that the indictment fell within the scope of the FCPA. On remand, a jury convicted both Defendants of the counts charged in the indictment. We now affirm the FCPA and obstruction of justice convictions.

I

American Rice, Inc. ("ARI") is a publicly-held company incorporated in Texas and based in Houston that exports rice to various parts of the world. It exported rice to Haiti in the 1990's, a time of political chaos and rampant corruption in that country, through Rice Corporation of Haiti ("RCH"), a subsidiary incorporated in Haiti. During that time, Murphy was ARI's President and Kay was its Vice President for Caribbean Operations.

Haiti levied both duties and taxes on rice importers. ARI, through Murphy and Kay, took various steps to reduce those costs: purchasing from government officials licenses, called "franchises," permitting charities to import food without duty; paying for a "service corporation" designation for RCH, which allowed the company to avoid paying sales and income taxes by claiming that it did not actually own the products it was importing; underreporting imports to reduce duties and taxes and paying officials to accept the underreporting; and paying officials to resolve another tax issue. While these payments, if made domestically, would surely pose serious issues of criminal liability, the standard

2

practice of Haitian government officials was to routinely press companies like RCH to pay for local service, and almost all companies, including RCH's competitors, paid. In short, paying officials for government service and escape from obstacles to business including taxes was "business as usual" in Haiti during the 1990's.

In 1999, ARI retained a prominent Houston law firm to represent it in a civil suit. Preparing for this suit, the lawyers asked Kay for background information on ARI's rice business in Haiti. Kay volunteered that he had taken the actions mentioned above, explaining that doing so was part of doing business in Haiti. Those lawyers informed ARI's directors. The directors self-reported these activities to government regulators.

The SEC launched an investigation into ARI, Murphy, and Kay. Murphy and Kay were eventually indicted on twelve counts of violating the FCPA, 15 U.S.C. §§ 78dd-2, 78ff, which makes it a crime to (1) "willfully;" (2) "make use of the mails or any means or instrumentality of interstate commerce;" (3) "corruptly;" (4) "in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to;" (5) "any foreign official;" (6) "for purposes of [either] influencing any act or decision of such foreign official in his official capacity [or] inducing such foreign official to do or omit to do any act

3

in violation of the lawful duty of such official [or] securing any improper advantage;" (7) "in order to assist such [corporation] in obtaining or retaining business for or with, or directing business to, any person." The Government never charged ARI, or Defendants civilly, under the FCPA.

In 2002, the district court granted a motion to dismiss the indictment, concluding that "payments to foreign government officials made for the purpose of reducing customs duties and taxes [do not] fall under the scope of 'obtaining or retaining business' pursuant to the text of the FCPA"[1] (Kay I). This court reversed on appeal (Kay II). After a rigorous analysis of the FCPA and its legislative history, we concluded that "in diametric opposition to the district court . . . [,] that bribes paid to foreign officials in consideration for unlawful evasion of customs duties and sales taxes could fall within the purview of the FCPA's proscription," but "[i]t still must be shown that the bribery was intended to produce an effect - here, through tax savings - that would 'assist in obtaining or retaining business.'"[2] The panel left to the district court on remand whether further prosecution of this case would deny Defendants due process for want of fair warning.

---

[1] United States v. Kay, 200 F. Supp. 2d 681, 682 (S.D. Tex. 2002).

[2] United States v. Kay, 359 F.3d 738, 756 (5th Cir. 2004).

Back in district court, the Defendants moved to dismiss for lack of fair warning. The district court denied the motion. The Government then filed a superseding indictment repeating the first twelve counts but also charging both Defendants with conspiracy to violate the FCPA and Murphy with obstruction of justice for making false statements to the SEC during its investigation. A jury in Houston found Defendants guilty on all counts. Defendants renewed their lack of fair warning argument in post-trial motions to dismiss and arrest judgment, which the court denied. Murphy and Kay appeal, asserting several grounds, including lack of fair warning.

## II

Defendants argue that the statute failed to give fair notice that their conduct was illegal and that proceeding to trial with the late arriving clarification of the Act violated their due process rights. The district court denied Defendants' motion to dismiss the indictment and the jury convicted Kay and Murphy. This court reviews de novo the district court's denial of a motion to dismiss an indictment.[3] We also review de novo the underlying substantive

---

[3] United States v. Wilson, 249 F.3d 366, 371 (5th Cir. 2001).

issue of whether application of this court's last opinion in this case violates the Due Process Clause.[4]

Bouie provides the appropriate standard of fair notice in the present case. The Supreme Court in Bouie recognized two fair notice concerns in criminal statutes, including the vagueness of the statute's language and courts' retroactive enlargement of the scope of a statute, whether the statutory language underlying that enlargement is clear on its face or vague.[5] The Court only applied the latter principle of retroactive enlargement to the facts in Bouie, however, since the terms of the statute were clear.[6] Lanier expanded upon these standards, in a manner consistent with Bouie, and summarized two additional tests for fair notice: the rule of lenity, and a "touchstone principle" of fair notice, which combines the standards of statutory vagueness and judicial enlargement to determine fair notice.[7]

---

[4] Cf. De Zavala v. Ashcroft, 385 F.3d 879, 893 (5th Cir. 2004) ("We review due process challenges de novo.")

[5] Bouie v. City of Columbia, 378 U.S. 347, 352 (1964).

[6] Id. at 351.

[7] United States v. Lanier, 520 U.S. 259, 266-67 (1997).

6

Kay and Murphy address all four of the Lanier standards of fair notice in their appeal[8]: 1) enforcement of a vague statute, 2) the rule of lenity, 3) retroactive application of a "novel" interpretation of a statute, and 4) whether the statute, "standing alone or as construed," made the law reasonably clear when the criminal conduct occurred.[9] Under the fair notice principle of vagueness, they argue that this court's "finding that the statute was ambiguous as a matter of law . . . should have led the Court to dismiss this prosecution under the vagueness doctrine . . . ."[10] Although Defendants argue, and we agreed in Kay II, that the business nexus standard is ambiguous,[11] it does not follow that the standard requires guesswork or that the statutory language itself is vague.

The Court in Lanier defines a vague statute as one "which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."[12] The FCPA delineates seven standards that may lead to a

---

[8] Each defendant has adopted the other's arguments.

[9] Lanier, 520 U.S. at 266-67.

[10] Kay Br. at 53.

[11] Kay II, 359 F.3d at 746-47.

[12] Lanier, 520 U.S. at 266.

7

conviction. All are phrased in terms that are reasonably clear so as to allow the common interpreter to understand their meaning. Defendants have, rather than showing vagueness, raised a technical interpretive question as to the exact meaning of "obtaining or retaining" business. Whether "obtaining or retaining" business covers the general activities that an entity undertakes to ensure continued success of a business or Defendants' more limited definition of contractual business is an ambiguity but not one that rises to the level of vagueness and unfair notice.

Nor is the FCPA's business nexus test vague under McBoyle, which originally defined the vagueness standard in the context of fair warning. Similar to Lanier's "common intelligence" test, the McBoyle test for vagueness requires that "fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed . . . so far as possible the line should be clear."[13] Imprecise general language in one of seven requirements for a bribery conviction under the FCPA does not draw a line so vague that Defendants were not reasonably aware of their potential for engaging in illegal activity under the FCPA when they made payments to Haitian officials to reduce tax and duty burdens through

---

[13] McBoyle v. United States, 283 U.S. 25, 27 (1931).

8

misrepresentation. Although ARI did not make corrupt payments to guarantee one particular contract's success, ARI ensured, through bribery, that it could continue to sell its rice without having to pay the full tax and customs duties demanded of it. Trial testimony indicates that ARI believed these payments were necessary to compete with other companies that paid lower or no taxes on similar imports[14] – in other words, in order to retain business in Haiti, the company took measures to keep up with competitors.[15] The fact that other companies were guilty of similar bribery during the 1990's does not excuse ARI's actions; multiple violations of a law do not make those violations legal or create vagueness in the law.

A man of common intelligence would have understood that ARI, in bribing foreign officials, was treading close to a reasonably-defined line of illegality. As the Supreme Court in Boyce held, "no more than a reasonable degree of certainty can be demanded [in a criminal statute]. Nor is it unfair to require that one who

---

[14] Lawrence Henry Theriot, a consultant to ARI who provided "the eyes and ears of what the company needed to be alert to," discussed how "Haitian authorities were very aggressive in trying to collect the full amount of . . . taxes from Rice Corporation" and "'smugglers' were not paying the taxes on imported rice – or not paying a substantial part of the taxes . . . So, they proved to be very tough competitors against Rice Corporation, who was paying a substantial part of the taxes on the imported rice."

[15] We reached a similar conclusion in Kay II, finding that "[b]ribing foreign officials to lower taxes and customs duties certainly can provide an unfair advantage over competitors and thereby be of assistance to the payor in obtaining or retaining business." 359 F.3d at 749.

deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."[16] Defendants took this risk, and splitting hairs as to the illegality of one type of action under the business nexus test does not allow them to argue successfully that the FCPA's standards were vague.

In addition to arguing that the statutory language was vague, Defendants, although recognizing that this court must apply its own precedent established by Kay II, alternatively assert that the district court erred in its retroactive application of Kay II's interpretation of the FCPA to them. They argue that "Kay II extended criminal liability under the FCPA beyond the explicit terms of the Act."[17] In doing so, Defendants misconstrue Lanier's and Bouie's test for fair notice under retroactive application of a law. The Bouie fair notice test for

---

[16] Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 340 (1952). Boyce is a void for vagueness case but still applies in this case. The Court in Bouie clarified the distinction between "void for vagueness" and "fair notice" and the applicability of the void for vagueness test to fair notice questions. When a statute is void for vagueness, the language on its face is unclear. A statute that fails to provide fair notice, on the other hand, may be clear or unclear on its face but regardless, is applied to conduct outside of the scope of the statute, thus retroactively punishing the defendant for an act that he could not have reasonably expected to fall under the statute's prohibitions. The Court found that the fair notice doctrine is broader than the void for vagueness doctrine, since a conviction under a statute can violate the fair notice doctrine when a statute is void for vagueness or when a defendant is retroactively punished under an "expansion" of a clear statute. Void for vagueness analysis is, however, therefore, still applicable to the question of vagueness in a fair notice case. See Bouie, 378 U.S. at 351-52.

[17] Kay argued: "Because Kay II extended criminal liability under the FCPA beyond the explicit terms of the Act, defendant could not have had fair notice at the time of their conduct that the conduct was subject to criminal punishment under Kay II."

retroactive enlargement ("where construction unexpectedly broadens a statute which on its face had been definite and precise"[18]) asks whether a court has held an individual "criminally responsible for conduct which he could not reasonably be proscribed" due to the statute's failure "to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden . . . ."[19] Similarly, the Lanier fair notice test for judicial expansion of the scope of a statute is whether the court applied a "novel construction" of the statute to conduct not addressed by the statute or by previous cases. In Bouie, the state court had retroactively added a distinct category of illegal conduct to the statute – finding that individuals who remained in a restaurant after being asked to leave violated a statute that had previously only prohibited entry onto land after notification that such entry was illegal.[20] The state court, in expanding the trespass statute, drew upon the civil, not the criminal law, of trespass.[21]

We are not persuaded that this court in Kay II or the district court in applying it, expanded the scope of the FCPA or created a new and independent principle of law. The explicit terms of the FCPA do not include either language

---

[18] Bouie, 378 U.S. at 353.

[19] Id. at 351.

[20] Id. at 349-50.

[21] Id. at 357-58.

11

relating specifically to contracts or defining more general business practices that may fall under the business nexus test, with the exception of the Act's allowance of "grease" payments. We are not persuaded that the district court's determination that the facts of the case fell within the FCPA's terms of illegality extended the Act beyond its explicit terms.

Our in-depth investigation of one factor's – the business nexus test's – applicability to a specific action, out of a total of seven factors that define illegal bribery under the FCPA, was not an extension of the Act's terms but rather an interpretation and application of its meaning to the facts of the case. A person of common intelligence should have been reasonably aware of this meaning in the 1990's. Paying taxes and customs duties is inherent to foreign business, and decreasing these payments through bribery, as Defendants have admitted, was common practice in Haiti. If bribery to obtain favorable tax and customs obligations was indeed as common as established in the record, then it is reasonable to imply that businesses viewed these practices as one of the only guarantees of maintaining a successful business in Haiti in the 1990's. It is not therefore a novel application of the law for the district court to find that Defendants made these payments for the purpose of "retaining business."

Defendants rely to a large extent on this court's investigation of the FCPA's legislative history in arguing that the district court retroactively applied law beyond the original scope of the Act, and they assert that "[r]eliance on legislative history (much less history as sparse as the FCPA's) to resolve the meaning of a criminal statute is rarely appropriate." We do not agree. As we discuss in further detail when we turn to the rule of lenity, the Supreme Court has found, since Crandon[22] and Hughey,[23] that courts should rely on all available sources, including legislative history, when interpreting a potentially ambiguous statute and should find ambiguity only when none of those sources adequately resolve the issue.[24] This court's investigation of the FCPA's legislative history does not indicate that in interpreting the Act, we required the district court to use a novel application of the law or that the FCPA is vague. Rather, the history serves as additional support for the court's resolution of the ambiguity of the business nexus test. This Court looked to numerous aspects of the Act – its text, its title, its "grease payments" exception, the dictionary definition of "business," and the Act's legislative history. And although we found that "the statute itself"

---

[22] Crandon v. United States, 494 U.S. 152 (1990).

[23] Hughey v. United States, 495 U.S. 411 (1990).

[24] See infra note 40 and accompanying text.

13

was "amenable to more than one reasonable interpretation" and therefore "ambiguous as a matter of law"[25] absent its legislative history, this does not indicate that we established a new interpretation of the law.

A third test under Lanier – that case's "touchstone principle" – raises similar questions of retroactivity and vagueness in asking "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."[26] This addresses both interpretation of the statute "standing alone" and a court's enlargement of a statute in "constru[ing]" the statute, whether by interpreting the statute or applying relevant case law. The FCPA was just as clear in the 1990's – when Defendants' relevant conduct occurred – as it is today. In Kay II we determined that the FCPA was not void for vagueness[27] but rather contained an ambiguous provision. Defendants here fail in their understandable and able effort to inflate the ambiguity of the business nexus test into an issue of unfair notice under vagueness and retroactivity principles.

---

[25] Kay II, 359 F.3d at 746.

[26] Lanier, 520 U.S. at 267.

[27] Kay II, 359 F.3d at 744 n.16.

14

Defendants also make the most of the impact of sparse prior judicial interpretation, arguing: "In all prior reported prosecutions under the statute, the Government had charged only defendants whose conduct aimed at obtaining or retaining business by, for example, paying a bribe to secure a government contract." This by no means indicates that this narrow type of payment is the only conduct covered by the business nexus test, as suggested. Kay and Murphy's unlucky status as two of the few individuals that the Government has vigorously prosecuted under the Act does not permit them to argue successfully that they were unaware of the boundaries of illegality under the Act in the 1990's. As the Court in Lanier points out, the lack of prior court interpretations "fundamentally similar"[28] to the case in question does not create unfair notice. Defendants cannot therefore rely on the fact that courts have only interpreted the meaning of the business nexus test in the context of contracts to argue that they had inadequate notice of other reasonable applications of that test.

The Supreme Court has held that a defendant received fair notice under retroactive applications of law broader than Kay II's clarification of the ambiguity of a statute. In Rogers, for example, the Court upheld the Tennessee Supreme Court's retroactive abolition of the infrequently-used common law

---

[28] Lanier, 520 U.S. at 269.

principle that a defendant could not be found guilty of murder if the victim survived the injury by at least a year and a day.[29] The Court found that although Tennessee had not officially abolished the principle when the murder occurred, the law's rarity and the fact that many other jurisdictions had abolished it should have alerted defendant to the possibility that the law was no longer applicable.[30] Courts daily analyze the law's "fit" with the criminal act in question, and without some flexibility of interpretation and clarification, courts would be unable to apply effectively criminal laws to the specific facts of each case. As Rogers states, courts require "substantial leeway . . . as they engage in the daily task of formulating and passing upon criminal defenses and interpreting such doctrines as causation and intent, reevaluating and refining them as may be necessary to bring the common law into conformity with logic and common sense."[31] To find unfair notice whenever a court specified new types of acts to which a criminal statute applied would stifle courts' ability to interpret and fairly apply criminal statutes.

---

[29] Rogers v. Tennessee, 532 U.S. 451, 462 (2001).

[30] Id. at 464.

[31] Id. at 461-62.

16

When a statute is not vague but contains ambiguity, as occurs here under the FCPA, we must still consider the rule of lenity: while the "touchstone" of fair notice is reasonable clarity of the illegality of conduct when it occurred, "the touchstone of the rule of lenity is statutory ambiguity."[32] As the Court in Lanier applied the lenity doctrine, it "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered."[33] The rule is, however, a last resort of interpretation,[34] and "[t]he mere possibility of articulating a narrower construction [or an act] . . . does not by itself make the rule of lenity applicable."[35] The rule only applies in situations of ambiguity more extreme than here, where, "'after seizing everything from which aid can be derived, [a court] can make no more than a guess as to what Congress intended."[36] To address potential statutory ambiguity, the Supreme Court has relied upon "common usage,"[37] dictionaries,[38] the societal circumstances

---

[32] Moskal v. United States, 498 U.S. 103, 108 (1990) (internal quotations omitted).

[33] Lanier, 520 U.S. at 266.

[34] Moskal, 498 U.S. at 108.

[35] Smith v. United States, 508 U.S. 223, 239 (1993).

[36] Reno v. Koray, 515 U.S. 50, 65 (1995) (internal quotations and citations omitted).

[37] Smith, 508 U.S. at 240.

[38] Id.

surrounding the passage of an act,[39] legislative intent derived from the language of an act,[40] and legislative history[41] to clarify a law's meaning and thus avoid the rule of lenity. In Dixson, where petitioners argued that they did not fall within the scope of the federal bribery statute, the Supreme Court (like this court in Kay II) found that the words of the statute could support either petitioners' or the Government's interpretation of the statute and that one of the statute's terms was ambiguous. The Court used legislative history to clear up the ambiguity and found that petitioners could not, therefore, rely upon the rule of lenity.[42] Later, the Supreme Court in Hughey attempted to bar legislative history as a means of clarifying ambiguity and avoiding application of the rule of lenity,[43] but the Supreme Court and the Fifth Circuit have since affirmed that

---

[39] Id. (discussing the high rate of drug-related murders in the United States when Congress passed a statute punishing criminals' use of firearms in drug trafficking).

[40] Id. at 240 ("Congress affirmatively demonstrated that it meant to include transactions like petitioner's as 'us[ing] a firearm' by so employing those terms . . . .").

[41] See, e.g., Reves v. Ernst & Young, 507 U.S. 170, 184 n.8 (1993) ("Because the meaning of the statute is clear from its language and legislative history, we have no occasion to consider the application of the rule of lenity.").

[42] Dixson v. United States, 465 U.S. 482, 491, 496 (1984) (finding that "[i]f the legislative history fails to clarify the statutory language, our rule of lenity would compel us to construe the statute in favor of petitioners, as criminal defendants in these cases" but that Congress was clear in its intent to broadly define the statutory term at issue).

[43] Hughey v. United States, 495 U.S. 411, 422 (1990) ("[L]ongstanding principles of lenity . . . preclude our resolution of the ambiguity against petitioner on the basis of general declarations of policy in the statute and legislative history."(internal citation omitted)).

legislative history is an appropriate means of clarification under the rule.[44] Here, where the legislative history shows that "Congress meant to prohibit a range of payments wider than only those that directly influence the acquisition or retention of government contracts or similar commercial or industrial arrangements,"[45] the FCPA is not sufficiently ambiguous to merit application of the rule of lenity.

In sum, under all four Lanier tests, Defendants have failed to show that the FCPA, and the district court's application of it, failed to provide them fair notice.

## III

As Defendants indicate, the Government must prove, and a jury must find beyond a reasonable doubt, that Defendants both corruptly and willfully violated subsections (a) or (g) of § 78dd-1 of the FCPA to obtain a criminal conviction

---

[44] See, e.g., Moskal, 498 U.S. at 108 ("[W]e have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." (internal quotations omitted)); see also Holloway v. United States, 526 U.S. 1, 10, 12, n.14 (1999) (relying upon legislative history to conclude that Congress did not intend for a crime to be interpreted narrowly, and affirming that "[t]he rule of lenity applies only if, after seizing everything from which aid can be derived, . . . we can make no more than a guess as to what Congress intended" (emphasis added) (internal quotations omitted)); United States v. Reedy, 304 F.3d 358, 367 n.13 (5th Cir. 2002) (quoting Moskal).

[45] Kay II, 359 F.3d at 749.

under the Act.[46]  Here, a jury convicted Defendants on all counts for bribery that induced foreign officials to accept documents containing false reports of the quantities of rice that ARI imported to Haiti, thus reducing taxes and import duties in violation of FCPA, 15 U.S.C. §§ 78dd-1, 78-dd-2. Defendants argue that the district court failed to adequately instruct the jury on the element of willfulness and thus gave improper instructions as to mens rea.  We disagree.

The court's instructions to the jury indicated that "corruptly" was an element of the offense and defined a corrupt act as one that is "done voluntarily and intentionally, and with a bad purpose or evil motive of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means."  The court also instructed the jury on the definition of an act done "knowingly" (thus incorporating the willfulness element into its instructions) and defined a knowing act as one "done voluntarily and intentionally, not because of accident or mistake."  In response to a jury question as to whether "knowledge of the FCPA" could be "considered an accident or mistake," the court referred the jury to its definition of the term "knowingly." Defendants objected

---

[46] See 15 U.S.C. §78ff(c)(2)(A) ("Any officer, director, employee, or agent of an issuer, or stockholder acting on behalf of such issuer, who willfully violates subsection (a) or (g) of section 78dd-1 of this title shall be fined not more than $100,000, or imprisoned not more than 5 years, or both.")

to the instruction given to the jury and proposed two alternative jury instructions, thus preserving error.

We review preserved error in jury instructions under an abuse of discretion standard[47] and ask "whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them."[48] Under this standard, we must recognize that trial courts have "great latitude" in the court's decision to include or omit jury instructions.[49] The district court abuses its discretion only if a requested instruction "(1) is substantively correct; (2) is not substantially covered in the charge given to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense."[50] We find that the district court's instructions provided clear directions to the jury on all applicable principles of the FCPA and that Defendants' first requested instruction was not substantively correct; and the second, although technically correct but unnecessarily detailed, was substantially covered in the jury charge.

---

[47]  United States v. Daniels, 281 F.3d 168, 183 (5th Cir. 2002).

[48]  Id. (internal quotations omitted).

[49]  United States v. Correa-Ventura, 6 F.3d 1070, 1076 (5th Cir. 1993).

[50]  United States v. Simkanin, 420 F.3d 397, 410 (5th Cir. 2005).

Nor did the court's omission of both of the instructions seriously impair Defendants' defense.  The instructions still allowed Defendants to argue lack of knowledge of their bad acts, lack of intent to commit bad acts, and, more generally, lack of "corrupt" action.

Defendants did not argue at trial that the court should instruct the jury on a separate element of willfulness, but they proposed two alternatives to the court's instructions on the definition of "corruptly."  The alternative instructions would have required that an act done "corruptly" be done "willfully" and "knowingly" and with "specific intent" to either "violate the law" (in this case, by knowing that the FCPA prohibited Defendants' actions) or to "achieve an unlawful result by influencing a foreign public official's action in one's own favor."

The FCPA does not define "willfully," and we therefore look to the common law interpretation of this term[51] to determine the sufficiency of the jury instructions pertaining to the mens rea element.  The definition of "willful" in the criminal context remains unclear despite numerous opinions addressing this issue.  Three levels of interpretation have arisen that help to clear the haze.  Under all three, a defendant must have acted intentionally – not by accident or

---

[51]  See, e.g., Bryan v. United States, 524 U.S. 184, 193 (1998) (applying the Court's definition of willfulness "unless the text of the statute dictates a different result").

mistake.  The first and most basic interpretation of criminal willfulness is that committing an act, and having knowledge of that act, is criminal willfulness – provided that the actions fell within the category of actions defined as illegal under the applicable statute.  In these cases, the defendant need not have known of the specific terms of the statute or even the existence of the statute.  The defendant's knowledge that he committed the act is sufficient.[52]

The second and "intermediate" level of criminal willfulness requires the defendant to have known that his actions were in some way unlawful.[53]  Again, he need not have known of the specific statute, but rather he must have acted with the knowledge that he was doing a "bad" act under the general rules of law.  Under this intermediate level of criminal common law willfulness, "the Government must prove that the defendant acted with knowledge that his conduct was unlawful."[54]

---

[52]  See, e.g., Staples v. United States, 511 U.S. 602, 618-19 (1994) (defendant need only be aware that he has engaged in conduct that meets the statutory definition; he need not know of the statute or his violation of the statute).

[53]  See, e.g., Bryan, 524 U.S. at 191 nn.12-13, 191-92 (discussing multiple interpretations of criminal willfulness as meaning "not merely voluntarily, but with a bad purpose," "a thing done without ground for believing it is lawful," or "[d]oing or omitting to do a thing knowingly and willfully . . . not only [with] a knowledge of the thing, but a determination with a bad intent to do it or to omit doing it" (internal citations and quotations omitted)).

[54]  Ratzlaf v. United States, 510 U.S. 135, 137 (1994).

The strictest level of interpretation of criminal willfulness requires that the defendant knew the terms of the statute and that he was violating the statute. The courts have reserved this category to limited types of statutory violations involving "complex" statutes – namely those governing federal tax law and antistructuring transactions. Although the Fifth Circuit has not addressed the FCPA under this category, the Second Circuit has determined that the FCPA does not fall within this narrow category of complex statutes,[55] and we agree.

The district court's jury instructions captured both the first and second levels of criminal willfulness, but not the third and strictest interpretational level. We find the instructions sufficient, since the strictest interpretation of criminal willfulness is reserved for complex statutes. Under the first and broadest definition of criminal willfulness, the term "knowingly" in the context of willful criminal action "merely requires proof of knowledge of the facts that constitute the offense."[56] For example, a defendant need only have known that he possessed a weapon with the characteristics that fit within the definition of "machinegun" in the relevant statute;[57] he need not have been aware of the

---

[55] Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber, 327 F.3d 173, 181 (2d Cir. 2003) [hereinafter Stichting].

[56] Bryan, 524 U.S. at 193.

[57] Staples, 511 U.S. at 619 ("[T]he Government should have been required to prove that petitioner knew of the features of his AR-15 that brought it within the scope of the Act").

statute or that his possession of the gun violated the statute.[58] Indeed, at least one circuit has specifically found that "[k]nowledge by a defendant that it is violating the FCPA – that it is committing all the elements of an FCPA violation – is not itself an element of the FCPA crime."[59] The Court in Bryan affirmed that the "traditional rule" for criminal willfulness is that "ignorance of the law is no excuse,"[60] and that cases holding otherwise (requiring actual knowledge of violation of the law) have involved unusually complex statutes with the potential to implicate innocent individuals.[61]

The district court, by instructing the jury that a guilty verdict required a finding that defendant acted "voluntarily and intentionally, and with a bad purpose or evil motive of accomplishing either an unlawful end or result," and by including a separate "knowing" instruction, correctly indicated that the jury must identify evidence amounting to "knowledge of facts that constitute the

---

[58] Id. at 620. The Court did not concern itself with the question of knowledge of the law, but rather with wrongfully convicting "gun owners who were wholly ignorant of the offending characteristics of their weapons . . . ." Id. (emphasis added); see also Rogers v. United States, 522 U.S. 252, 254-55 (1998) (plurality opinion) ("It is not . . . necessary to prove that the defendant knew that his possession was unlawful or that the firearm was unregistered.").

[59] Stichting, 327 F.3d at 181.

[60] Bryan, 524 U.S. at 196; see also Cheek v. United States, 498 U.S. 192, 199-201 (1991) (discussing the particular complexity of the federal criminal tax laws and the Court's historic interpretation of these law, which led to a separate definition of willfulness for these laws).

[61] Bryan, 524 U.S. at 194-95.

offense" required by the traditional criminal definition of willfulness (which we have described as the first category of willfulness). The court's instructions also substantially covered the requested instruction that Defendants acted "corruptly," meaning they acted "knowingly and dishonestly, with the specific intent to achieve an unlawful result by influencing a foreign public official's action in one's own favor." The instructions suggested that illegal conduct under the FCPA defined the "unlawful end or result" to which the court referred, since the jury had to have some standard by which to gauge lawfulness. Additionally, the instructions correctly indicated that to be guilty under the Act, Defendants must have knowingly (i.e., voluntarily and intentionally) acted with awareness of these unlawful ends.[62]

---

[62] We are disturbed by the jury's confusion in this case as to the criminal intent element. The jury's question to the court of whether "knowingly" meant knowing violation of the FCPA ("Can lack of knowledge of the FCPA be considered an accident or mistake?") indicates that the jury was confused as to whether Defendants had to know specifically that they were violating the FCPA when they acted. But the jury need not have found this. Under our first definition of willfulness, Defendants' knowledge that they were committing the acts of corrupt bribery of foreign officials was sufficient. Given, Defendants' proffered instruction that would have required that a finding that they "knowingly and dishonestly, with the specific intent to achieve an unlawful result by influencing a foreign official's action in one's own favor" would have helped the jury understand that the "unlawful ends" in the court's instructions on "unlawful end or result . . . or unlawful method or means" could refer to specific knowledge that one was committing a corrupt act as defined by the FCPA. But even if the jury understood "unlawful ends" in the more general sense – of acting with a bad or unlawful purpose – this is an acceptable definition of criminal willfulness, which we describe as the "intermediate" definition of willfulness and discuss below.

The district court's instructions, in defining the willfulness standard as requiring knowledge that the acts committed were unlawful acts, were also adequate despite their omission of the exact term "specific intent," which was proposed by Defendants in their second instruction. We have defined specific intent crimes as those involving "willful and knowing engagement in criminal behavior."[63] To instruct on specific intent, a court should require the jury "to find that [defendant] intended to do something unlawful."[64] The court gave such an instruction here, despite its failure to use the phrase "specific intent." Where we have struck down jury instructions for failure to convey specific intent, we have done so on the grounds that the court mistakenly thought that the crime was a general intent crime and therefore refused to instruct that the defendant had intended to act unlawfully.[65] Additionally, as discussed in further detail below, Defendants need not have specifically known that they were violating the FCPA in this case; only those cases that involve unusually complex statutes require

---

[63] United States v. Berrios-Centeno, 250 F.3d 294, 299 (5th Cir. 2001).

[64] United States v. Burroughs, 876 F.2d 366, 369 (5th Cir. 1989).

[65] Id. at 368-69 (finding that the court mistakenly believed that the drug conspiracy was a general intent crime and that the "[charge] language does not address the requisite intent to break the law by her 'voluntary' actions. It thus does not compensate for the district court's incorrect definition of 'willful' or its omission of any reference to 'specific intent,' 'unlawfulness,' 'purposeful intent to violate the law,' or any like language that would have suggested the need to find specific intent").

27

defendants to have specific knowledge that they are violating a statute.[66] Indeed, the district court's jury instructions closely track the language that the Court in Bryan approved as correctly defining criminal willfulness.[67]

Because there are multiple definitions of criminal willfulness, however, we also look to stricter standards of willfulness to consider whether Defendants' instructions were substantively correct and whether omission of those instructions seriously impaired an effective defense. We find that the district court's jury instructions also capture our second, or intermediate, definition of criminal willfulness – a definition that we commonly follow[68] – that a defendant

---

[66] See, e.g., Cheek, 498 U.S. at 200 ("Congress has . . . softened the impact of the common-law presumption by making specific intent to violate the law an element of certain federal criminal tax offenses. Thus, the Court . . . interpreted the statutory term 'willfully' as used in the federal criminal tax statutes as carving out an exception to the traditional rule. This special treatment of criminal tax offenses is largely due to the complexity of the tax laws."); Bryan, 524 U.S. at 194-95 (distinguishing the cases where "the jury must find that the defendant was aware of the specific provision of the tax code that he was charged with violating" (emphasis added)).

[67] Bryan, 524 U.S. at 190. The jury instructions in Bryan read as follows: "A person acts willfully if he acts intentionally and purposely and with the intent to do something the law forbids, that is, with the bad purpose to disobey or to disregard the law. Now, the person need not be aware of the specific law or rule that his conduct may be violating. But he must act with the intent to do something that the law forbids." Id.

[68] See, e.g., Burroughs, 876 F.2d at 368 (describing "'willfully'" to mean that "'the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law'" (quoting U.S. Fifth Circuit District Judges Association Pattern Jury Instruction (Criminal), Basic Instruction 9A, at 21 (1983) (emphasis added)); United States v. Wilkes, 685 F.2d 135, 138 (5th Cir. 1982) (upholding instructions that defined "willful as incorporating a 'bad purpose either to disobey or to disregard the law'").

28

knew that he was doing something generally "unlawful" at the time of his action. This level of interpretation is stricter than the first because it does not only require that the defendant knew that he was committing an act (an act which, incidentally, falls within the definition of the relevant statute); the defendant must have known that the act was in some way wrong. The district court's jury instructions captured this level of intent well with their requirement that the jury find that Defendants acted "with a bad purpose or evil motive."

Finally, the statute here does not fall within the narrow exception to the Bryan Court's rule. Under this rare exception (which covers our third and "strictest" level of criminal willfulness), a defendant must know the specific law that he is violating in order to act willfully. The "highly technical" exceptional statutes to which the Court in Bryan refers are federal tax laws, for which the Court has explicitly "carv[ed] out an exception to the traditional rule" that ignorance of the law is no excuse,[69] and a complicated statute addressing structuring of cash transactions, where the Court limited its holding specifically to antistructuring laws.[70] We have agreed that willfulness does not generally

---

[69] Cheek, 498 U.S. at 200 (citing United States v. Bishop, 412 U.S. 346 (1973)); United States v. Pomponio, 429 U.S. 10, 12 (1976) (For cases involving tax statutes, the exception defines willfulness as the "voluntary, intentional violation of a known legal duty") (internal quotations omitted)).

[70] Ratzlaf v. United States, 510 U.S. 135, 137 (1994) ("To establish that a defendant 'willfully violat[ed]' the antistructuring law, the Government must prove that the defendant

29

require that the defendant knew that he was violating the specific provisions of a law.[71]  Although the Fifth Circuit has not directly addressed this issue in the context of the FCPA, the Second Circuit has held that "[f]ederal statutes in which the defendant's knowledge that he or she is violating the statute is an element of the violation are rare; the FCPA is plainly not such a statute."[72]  Thus, the instructions need not have, as Defendants argued, indicated that the jury "must find that the defendant knew that the Foreign Corrupt Practices Act prohibited American businessmen from providing anything of value to a foreign official in order to obtain or retain business . . . ."  This level of specificity was not required here.

The instructions' requirements that Defendants acted corruptly, with an "unlawful end or result," and committed "intentional" and "knowing" acts with a bad motive sufficiently captured the definition of criminal willfulness that we follow.  They also allowed Defendants to effectively put forth adequate defenses: Defendants could have argued lack of intent and that they were not acting with

---

acted with knowledge that his conduct was unlawful.").

[71]  United States v. Garcia, 762 F.2d 1222, 1224 (5th Cir. 1985) (rejecting defendant's arguments that the jury instructions were erroneous because they "did not clearly require that the Defendant have knowledge of the particular law allegedly violated.").

[72] Stichting, 327 F.3d at 181.

knowledge of unlawful means or ends. The district court's jury instructions adequately conveyed the "willfulness" required for a conviction under the FCPA.

IV

Defendants argue that in addition to improperly instructing the jury on the element of willfulness, the district court allowed the jury to convict based on a defective indictment that omitted the element of willfulness. We review this issue de novo[73] and will find an indictment to be sufficient if it "alleges every element of the crime charged and in such a way as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding."[74]

The second superseding indictment upon which the jury convicted Defendants indeed omitted the term "willful." However, this omission was harmless error at most, as the language of the indictment described the exact type of conduct required for a finding of willfulness. As we discussed in detail in the context of jury instructions, criminal willfulness requires only that criminal defendants have knowledge that they are acting unlawfully or "knowledge of the facts that constitute the offense," depending on the definition followed, unless

---

[73] United States v. Ratcliff, 488 F.3d 639, 643 (5th Cir. 2007).

[74] Id. (internal quotations omitted).

31

the statutory text provides an alternate definition of this element.[75]  The FCPA

does not define willfulness, so we rely upon the common law definition.

The indictment in this case was not required to contain the exact term

"willfulness."  This court has specifically found that an indictment alleging that

defendant "corruptly did endeavor" sufficiently "charges an intentional act,"

which is "interchangeable with the term willful."[76]  Similarly, by alleging that

Defendants in this case themselves "paid bribes and authorized the payment of

bribes;"[77] "acted on his [sic] own behalf and as an agent of American Rice, Inc.,"[78]

to reduce customs duties; paid bribes to underreport import quantities because

Defendants "believed"[79] that they would otherwise lose sales to competitors;

"directed employees"[80] to make false shipping documents; and acted "corruptly"[81]

"in violation of their lawful duty,"[82] the indictment sufficiently alleged the

---

[75]  Bryan, 524 U.S. at 193.

[76]  United States v. Haas, 583 F.2d 216, 220 (5th Cir. 1978) (internal quotations omitted).

[77]  Second superseding indictment, Count 3.

[78]  Id., Count 6.

[79]  Id., Count 3.

[80]  Id., Count 5.

[81]  Id., Count 11.

[82]  Id.

element of willfulness by using language that directly asserted Defendants' knowing commission of acts that are unlawful generally and unlawful under the FCPA. The indictment's language sufficiently placed Defendants on notice of each element of the crime charged and allowed them to prepare an effective defense.

V

In addition to arguing that the indictment failed to allege willfulness, Defendants assert that the indictment insufficiently alleged, and the Government failed to prove at trial, that Defendants made "use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value" to foreign officials.[83] They claim that the Government only alleged in the indictment and proved at trial that Defendants used barges and similar interstate commerce for the false documents that underreported ARI's imports but failed to allege or prove that these false documents, or any other money or documents, were sent through interstate commerce "in furtherance" of the actual bribes. To the contrary, they argue, "the purpose of the bribe was to clear the

---

[83] 15 U.S.C. §§ 78dd-1(a), -2(a).

33

way for the acceptance of the shipping documents. That is, the bribes furthered the use of instrumentalities to ship the documents and rice into Haiti, not the other way around."[84]  Defendants further allege that "payments were made in person in Haiti, with cash drawn from local bank accounts."[85]

When we review a challenge to the sufficiency of the evidence underlying Defendants' conviction and Defendants have moved for a judgment of a acquittal, as they did here in their Rule 29 motions,[86] we ask "whether a rational juror could have found the elements of the offense proved beyond a reasonable doubt.  In so doing, we view the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in support of the jury verdict."[87]  A rational juror could have inferred from the evidence in this case that Defendants used interstate commerce "in furtherance of an offer, payment, promise to pay, or authorization of the payment of any

---

[84]  Murphy Reply Br. at 4.

[85]  Murphy Br. at 8.

[86]  Although the Government argues that we should apply a plain error standard of review for sufficiency of the evidence, as Defendants did not object to the jury instructions on the interstate commerce issue in their Rule 29 motions, we need not address this argument; we find that even under a more generous standard of review for Defendants (assuming they properly addressed the interstate commerce element in their Rule 29 motion), Defendants' claim fails.

[87]  United States v. Valles, 484 F.3d 745, 752 (5th Cir. 2007).

money, or offer, gift, promise to give, or authorization of the giving of anything of value to . . . any foreign official . . . ."

As to the sufficiency of the indictment, the language of the indictment arguably failed to allege that Defendants sent any money for their bribes through interstate commerce,[88] thus requiring us to address Defendants' argument that a defendant can only be convicted under the bribery portion of the FCPA if the defendant used the mails or other interstate commerce "in furtherance of making the bribe itself"[89] and not for more broad use of interstate commerce for activities that support the bribe payment.

This issue does not require us to look to the legislative history or the dictionary, as Defendants would have us do. The plain language of the statute applies to defendants that "make use of . . . any means or instrumentality of interstate commerce . . . in furtherance of an offer, payment, promise to pay, or

---

[88] Even this claim in Defendants' briefs is dubious, as the indictment alleges that "[i]n furtherance of bribes. . . defendants authorized employees of American Rice, Inc. to withdraw funds from American Rice, Inc. bank accounts and to pay these funds to officials of the Haitian government . . ." Second Superseding Indictment, Count 7. This language suggests that Defendants, since their company was based in America, sent funds through interstate commerce from America to Haiti to pay these bribes. Because the language does not specifically indicate this, however, we give Defendants' argument some credence and further address the indictment's allegations of documents, rather than money, that Defendants transported in furtherance of bribes.

[89] Murphy Br. at 8.

35

authorization [to pay] . . . ."[90] The indictment similarly alleges that Kay directed employees to, "in furtherance of . . . bribes . . . prepare shipping documents . . . that falsely represented the weight and value of the rice being exported to Haiti."[91]

Defendants attempt to portray the false shipping documents as a product of the bribes and argue that they therefore did not send the documents through interstate commerce "in furtherance" of bribes; rather, they argue, Defendants paid the bribes using cash in Haiti, and these cash bribes allowed ARI to carry a set of false documents with its Haitian-bound cargo. But the indictment alleges, and the evidence shows, a reverse causal chain: ARI used the false documents to calculate the bribes, sending the documents through interstate commerce "in furtherance" of the bribes. Under ARI's "Plan B," Theriot described in testimony how ARI based its bribes to customs officials on the shipping documents: ARI, in its false reports, reduced the quantity of rice that it was importing by 30 percent and paid customs officials 30 percent of this 30 percent reduction to induce the customs officials to continue to accept false documents. Joel Malebranche, a sales and plant manager for ARI in Haiti whose

---

[90] 15 U.S.C. § 78dd-2.

[91] Second superseding indictment, Count 5.

responsibility was to "clear the [ARI] vessels for customs," described in detail how the payments were made based on the false shipping documents. Under Plan B for underreporting the amount of rice imported to Haiti and paying customs officials to accept these underreported amounts, ARI sent two sets of documents for each shipment of rice. With the ship, they sent a stowage plan and invoice indicating the correct quantity of rice on board. Then, through DHL or Federal Express, they sent a set of false documents from Houston to Haiti, reporting lower quantities. These false documents, once they arrived in Haiti, allowed ARI employees to clear the vessel in port by writing a check; Kay calculated the amount to be paid by comparing the accurate and underreported quantities of rice. As an example of this system, Government Exhibit 1A showed the correct quantity of rice on board the vessel (7718 metric tons), while Exhibit 1C, accompanied by a Federal Express slip, showed a quantity of 6218 tons. Malebranche, when asked if he had to "make any payments to customs to cause them to accept these documents," responded that ARI had to make cash payments – which he clarified to consist of "a check to cash, which was then cashed at the bank" and used to pay the bribes – and affirmed that he used the "savings" number calculated by Kay (a fraction of the taxes saved from the

underreported amounts[92]) to "calculate how much had to be paid to the officials . . . . One third goes to the officials; and two thirds comes to us, to Rice Corporation." Government Exhibit 1G showed an ARI check, based on the calculation of the savings from underreported rice quantities, written to bribe Haitian officials.

The indictment, by alleging that the false documents transported by interstate means were transported "in furtherance" of bribes, accurately tracked the interstate commerce element of the FCPA and was supported by evidence from the case. It placed Defendants on notice as to the crime charged and allowed them to present an effective defense. The indictment and the evidence were therefore sufficient with respect to the interstate commerce element of the FCPA.

VI

During the SEC's investigation, Murphy was subpoenaed to produce documents and provide testimony. He withheld several documents referring to payments to Haitian officials, and denied during testimony knowledge of payment to customs officials or of the falsification of shipping documents.

---

[92] Government Exhibit 33, a January 20, 1998 e-mail from Kay, stated, "Share this with Joel then destroy." The exhibit shows the calculations that Kay used to determine, based on the "savings" from the underreported shipping quantities (sent via Federal Express or DHL from Houston to Haiti) as compared to the properly reported quantities (sent on the ship), the payments to customs officials.

Murphy was convicted on the obstruction charge.[93] He argues that the district court abused its discretion by refusing to give a requested good-faith jury instruction on this count. Assuming that Murphy's proffered instruction is substantively correct, we find no abuse of discretion because Murphy's instruction was substantially covered by the actual charge. The district court used the pattern jury instruction, which explains that one element of obstruction is "[t]hat the defendant's act was done 'corruptly,' that is, that the defendants acted knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice." Murphy's proffered jury instruction would have added that "good faith on the part of the defendant is simply inconsistent with a finding that the defendant acted with the corrupt intent required . . . . A person who acts, or causes another person to act, on a belief or an opinion honestly held is not punishable under this statute merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong."

The charge was sufficient without Murphy's requested instruction. While counsel understandably wanted the charge to contain the verbal footing for their close, the omission of those wished-for terms was not reversible error. The instruction given required the jury to find that Murphy "knowingly and

---

[93] 18 U.S.C. § 1505.

dishonestly" lied to the SEC, a finding which leaves no room for "good faith" and "honesty." Murphy's argument for inclusion relies heavily on Arthur Andersen LLP v. United States, where the Supreme Court vacated an obstruction conviction because a jury instruction, as it read it, permitted the jury to convict where the defendant innocently impeded the government's fact-finding ability.[94] In Arthur Andersen, the district court departed from the pattern instruction, removing the word "dishonestly," and with it much of the good-faith defense. Because the district court here followed the pattern instruction, there was no danger under the charge as given that Murphy could have been convicted of violating 18 U.S.C. § 1505 without a corrupt intent. We AFFIRM Murphy's conviction on count 14 for obstruction of justice.

VII

Defendants argue that the district court erred in refusing to admit certified tax receipts on the grounds of inadequate authentication. These documents – consisting of "bordeaus" (customs documents) and memos – would have allegedly shown that following initial underpayments at port, Defendants later engaged in reconciliations with the Haitian government where they substantially paid their taxes owed. Defendants also allege that the bordeaus,

---

[94] Arthur Andersen LLP v. United States, 544 U.S. 696, 706-07 (2005).

which indicate the "amount of rice recorded" in addition to taxes paid, would demonstrate that they mis-reported quantities and underpaid taxes to a lesser extent than claimed by the Government.

Defendants obtained the documents and gave them to the Government several weeks before trial but then sent them back to Haiti for certification. They provided certified copies of the documents to the Government the day before trial. The Government objected to the documents' admission on the basis that the documents were certified by the brother of a co-conspirator in the case, that the Government had not had sufficient time to test the documents, and that the documents were originally accompanied by a post stating that they were "Received from Murphy," not from the individual who later certified the documents. The Government argued that the authentication issues were of particular concern because the case dealt with false documentation. Further, Defendants were unable to locate the originals of the documents or explain why they were unavailable. The district court refused to admit the documents and, although not providing an explicit reason, apparently did so under Rule 403 of the Federal Rules of Evidence. We review a district court's exclusion of relevant evidence under Rule 403 for an abuse of discretion,[95] and, if we find an abuse of

---

[95] United States v. Jimenez, 256 F.3d 330, 341 (5th Cir. 2001).

discretion, we find reversible error only if the ruling affected a substantial right.[96]

To preserve error in an evidentiary ruling excluding evidence under Rule 103(a), a defendant must make an "offer of proof" of evidence, meaning that "the substance of the evidence" must have been "made known to the court by offer" or must have been "apparent from the context within which questions were asked."[97] The defendant need not renew his objection to the exclusion of evidence "[o]nce the court makes a definitive ruling on the record admitting or excluding evidence . . . ."[98] If Defendants had failed to make an offer of proof in this case, as the Government claims, then we would not address the court's decision to exclude the evidence.[99] However, a formal offer of proof was not necessary here.[100] By explaining to the court the substance of the proffered evidence (receipts indicating tax payments that Defendants made after

---

[96] Guy v. Crown Equip. Corp., 394 F.3d 320, 324 (5th Cir. 2004); United States v. Hicks, 389 F.3d 514, 524 (5th Cir. 2004).

[97] FED. R. EVID. 103(a)(2).

[98] FED. R. EVID. 103(a).

[99] United States v. Winkle, 587 F.2d 705, 710 (5th Cir. 1979).

[100] United States v. Clements, 73 F.3d 1330, 1336 (5th Cir. 1996); see also United States v. Ballis, 28 F.3d 1399, 1406 (5th Cir. 1994) ("[E]xcluded evidence is sufficiently preserved for review when the trial court has been informed as to what counsel intends to show by the evidence and why it should be admitted, and this court has a record upon which we may adequately examine the propriety and harmfulness of the ruling").

shipments were complete) and why the court should admit these documents[101] (describing how the documents had been "subscribed and sworn – and certified by the United States vice counsel"), Defendants made a sufficient "informal" offer of proof. Although Defendants did not renew their attempt to admit the evidence in trial after the court's decision to exclude, the court definitively rejected the evidence in its pre-trial ruling.[102] No further objections by Defendants were necessary.

Although Defendants properly objected to the district court's ruling, the district court did not abuse its discretion here. Defendants attempted to introduce the documents at the last minute, and the court could have reasonably concluded that they would create confusion or unfair prejudice. Additionally, the Government provided evidence that the documents were certified by a potentially biased party. Because the district court did not provide reasons (certification, relevance, or others) for the exclusion of the evidence, however, we also determine whether, if there was any error, it was reversible.

---

[101] See Ballis, 28 F.3d at 1406 (counsel must demonstrate "what counsel intends to show by the evidence and why it should be admitted.")

[102] See, e.g., Jimenez, 256 F.3d at 342-43 (5th Cir. 2001) (although "[o]bjecting to an in limine order excluding testimony or evidence does not relieve a party from making an offer of proof" at trial, an informal offer of proof may be sufficient "when the trial court makes clear that it does not wish to hear further argument on the issue").

43

Defendants failed to show that their "substantial rights" were affected by the district court's exclusion of the evidence, and therefore the court's decision did not result in reversible error.[103]  To show that the court's decision to exclude the evidence affected their substantial rights, Defendants must demonstrate that the ruling "affected the outcome of the proceedings."[104]  The jury here could still have found Defendants guilty if the court had admitted the tax documents. Regardless of whether the tax documents presented evidence that Defendants paid a substantial amount of their taxes in later reconciliations with the Haitian government, as Defendants claim, this fails to diminish the weight of the Government's ample evidence demonstrating that Defendants initially based their tax payments on false reports of the quantity of rice they imported, which Defendants then used to calculate bribes to customs officials and to ensure acceptance of further false reports.

Although Defendants also argue that some of the excluded documents demonstrate that they reported more of their rice imports than the Government alleged at trial, they do not suggest that the documents show that Defendants reported the amounts honestly, or in full.  Rather, they allege that the excluded

---

[103]  FED. R. EVID. 103 (a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected.").

[104]  United States v. Cuellar, 478 F.3d 282, 295 (5th Cir. 2007) (internal quotations omitted).

44

evidence would have indicated that "RCH received much less, if any, actual tax benefit from the commission payments it made."[105]  The district court had no such evidence that the documents actually demonstrated this – nor do we.  And Defendants' claims that they received less "tax benefit" than alleged by the Government skirt the central matter of the case: Defendants underreported quantities of rice and made bribes to continue this false reporting, which in turn allowed for underpayment of taxes and customs duties at port.  Whether Defendants actually obtained substantial tax benefits is a collateral matter.  The district court did not abuse its discretion in excluding the evidence and, even if it had, Defendants have failed to demonstrate that the court's exclusion of the documents affected their substantial rights by changing the outcome of the case.

VIII

The foreign payments in this case came to the attention of the SEC after Kay voluntarily revealed ARI's conduct to company counsel.  Kay, however, refused to speak to a second set of investigating lawyers and, when later subpoenaed, he invoked the Fifth Amendment and refused to testify regarding the payments.  At trial, Kay disclosed his intent to introduce testimony of his pre-indictment reports at trial, to suggest that his disclosures evidence his belief

---

[105] Murphy Br. at 24.

45

that his actions had been lawful. Responding to Kay's in limine request, the district court defined Kay's exposure to cross examination should he so testify. The district court ruled that the Government would be able ask Kay whether he had appeared before the SEC and whether Kay had been asked to appear, but no more; and that the court would then if requested by Kay instruct the jury on Kay's Fifth Amendment rights.

In some circumstances, Kay's response to this question and the court's jury instructions may have improperly alerted the jury to Kay's invocation of his Fifth Amendment rights and, despite the court's proposed instruction to the jury in its ruling, would have violated the Fifth Amendment protection guaranteed by Hale.[106]   But here the court's ruling was tailored to prevent Kay from selectively using his Fifth Amendment rights as a "sword," while simultaneously benefitting from the shield created by these rights, and allowed the Government to reasonably respond to Kay's testimony.

Kay correctly asserts that Hale erects a fortress around the Fifth Amendment by barring mention in criminal court of a defendant's silence following arrest.[107]   Without this protection, the right against self incrimination

---

[106]   United States v. Hale, 422 U.S. 171, 181 (1975).

[107]   Id.

would be diluted by the high risk that juries might draw a "strong negative inference" from this silence.[108]  Although we find, contrary to the Government's assertions, that Kay properly preserved the Fifth Amendment issue under Luce, we find no Hale violation here.

The Government argues that under Luce, Kay failed to preserve the Fifth Amendment issue.  Its reliance is misplaced.  As the Government admits in its own brief, "this case is not exactly like Luce"; in fact, this case bears little resemblance to Luce, where the Court found that a defendant must testify in order to preserve claims under Rule 609(a)(1) of the Federal Rules of Evidence.[109]  Here, Kay did testify.  Although he did not testify regarding his prior statements about payments, Kay's proposed testimony was clear: he proposed to testify that he voluntarily told the company's lawyers about the payments as evidence that he thought the payments were lawful.  The court also made clear that it would allow the Government to elicit on cross that Kay refused to respond to the SEC and that it would instruct the jury that Kay had a constitutional right to not respond to the SEC.[110]  It is true that the district court's initial ruling in Luce

---

[108]  Id. at 180.

[109]  Luce v. United States, 469 U.S. 38, 41 (1984).

[110]  The district court made it clear in this case that its determination was final, and it made this clarification immediately prior to Kay's testimony. The court confirmed attorney Urofsky's clarification that, if Kay offered evidence that he revealed ARI's activities to his

was "subject to change when the case unfold[ed]," but the Court there was particularly concerned with situations where "defendant's 'actual' testimony [may] differ[] from what was contained in the defendant's proffer."[111] This was not an issue here. Before Kay testified, counsel and the court had made clear the proposed testimony on voluntary disclosure of payments, as well as the court's proposed treatment of that testimony if he chose to offer it. In Luce, it was "unknowable."[112]

Kay preserved his Fifth Amendment claim. We find, however, that the district court did not err in its ruling. The Supreme Court has found that when a "prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel,"[113] there is no violation of the Fifth Amendment privilege against self-incrimination. As Justice Stevens put it, "the protective shield of the Fifth Amendment should [not] be converted into a sword that cuts back on the area of legitimate comment by the prosecutor

---

attorneys (thus suggesting he was honest), the court would allow the Government to ask Kay, "Did you talk to SEC?" The court further explained "And then it opens it up for two questions from you [the Government] with my offer of an instruction . . . that's the end of it. Okay? No more." (emphasis added).

[111] Luce, 469 U.S. at 41.

[112] Id.

[113] United States v. Robinson, 485 U.S. 25, 32 (1988).

on the weaknesses in the defense case."[114]   Applying the Griffin Court's

prohibition against comment on Fifth Amendment silence to "forbid the

prosecutor from fairly responding to an argument of the defendant by adverting

to that silence"[115] would have been improper here.

Although Appellant's prior initial statements to his attorney may have

been consistent with his later invocation of the Fifth Amendment privilege[116] (as

required if he wished to receive Hale protection),[117] his pre-indictment silence,

when a second set of lawyers wished to inquire further as to his earlier

disclosures, is not consistent with his initial disclosure of information.  Kay

claims that the Government sought Fifth Amendment impeachment "only as a

---

[114]  United States v. Hastings, 461 U.S. 499, 515 (1983) (Stevens, J., concurring).

[115]  Robinson, 485 U.S. at 34.

[116]  His post-indictment silence and pre-indictment statements appear to be consistent under all three of Grunewald's tests for consistency.  First, although Kay did not speak about the payments after being indicted and therefore made no "repeated assertions" of innocence during proceedings, his initial revelation of the payments demonstrates his belief that he was innocent. Hale, 422 U.S. at 178 (citing Grunewald v. United States, 353 U.S. 391, 422 (1957)). Second, Kay asserted his right to silence in a secretive proceeding by refusing to speak when subpoenaed. As the Court in Grunewald found: "Innocent men are more likely to plead the privilege in secret proceedings, where they testify without advice of counsel and without opportunity for cross-examination."  353 U.S. at 422-23. Finally, Kay reasonably believed that he was a potential defendant when the SEC subpoenaed him, and it was therefore "natural for him to fear that he was being asked questions for the very purpose of providing evidence against himself."  Id. at 423.

[117]  Grunewald, 353 U.S. at 418–20 (prosecution may impeach defendant regarding invocation of the Fifth Amendment privilege if defendant's use of the privilege is "in fact inconsistent" with his testimony").

naked quid pro quo, to exact a price for Kay's testimony,"[118] but the record shows otherwise. The Government plausibly argued before the district court that if Kay's attorney cross-examined him on his initial disclosure of ARI's bribery, this would suggest that Kay was "the reporter . . . the complainant . . . the one who started this whole thing" – the honest individual who initiated the events leading to the investigation. Kay would have been able to use this testimony to his advantage and block any cross examination as to his subsequent refusal to talk by later invoking the Fifth Amendment.

The district court properly tailored the Government's response to Kay's proposed use of the testimony by allowing the Government – if Kay testified as to his initial statements – to ask if Kay was summoned by the SEC and whether he responded but not about his refusal to respond to lawyers engaged by the company to conduct an internal investigation.

Thus, the court made a fair and proportional response in admitting and excluding some evidence. The court recognized here that Kay had a fundamental right to silence, yet he wished to invoke the positive inference of his disclosures by testifying about his disclosures and simultaneously avoid any mention of later silence that could damage this inference. Entirely preventing

---

[118] Kay Repl. Br. at 27.

Government questioning related to Kay's disclosures and silence would have prevented the Government from sufficiently responding to Kay's testimony. We find no Fifth Amendment violation.

IX

Murphy contests the district court's decision to increase his sentence by two levels for an abuse of trust under § 3B1.3 of the Federal Sentencing Guidelines. Although post-Booker, the Sentencing Guidelines are only advisory,[119] we must still ensure that the district court properly applied the guidelines when enhancing a sentence under the guidelines range.[120] Under § 3B1.3, a defendant commits an abuse of trust by "abus[ing] a position of public or private trust, or us[ing] a special skill, in a manner that significantly facilitate[s] the commission or concealment of the offense . . . ."

We read the abuse of trust standard as a two-part test, asking "(1) whether the defendant occupies a position of trust and (2) whether the defendant abused her position in a manner that significantly facilitated the commission or concealment of the offense."[121] We further define significant facilitation by

---

[119] United States v. Booker, 543 U.S. 220, 246 (2005).

[120] See, e.g., United States v. Villegas, 404 F.3d 355, 362 (5th Cir. 2005) (per curium).

[121] United States v. Jobe, 101 F.3d 1046, 1065 (5th Cir. 1996) (quoting United States v. Fisher, 7 F.3d 69, 70-71 (5th Cir. 1993)).

51

determining "whether the defendant occupied a superior position, relative to all people in a position to commit the offense, as a result of her job."[122]  Although in Sudeen we questioned the first prong and suggested that defendant need not "legitimately" occupy a position of trust,[123] we have not overruled this test and therefore apply it here.  We review the court's legal interpretation of § 3B1.3 de novo, with deference to the district court.[124]  We also review the question of whether Defendants occupied a position of trust de novo, while we review the abuse of trust for commission or concealment of an offense for clear error.[125]

In reviewing the court's enhancement, we first determine whether an abuse of trust or skill is part of the FCPA (the base offense) or a specific characteristic of the FCPA. If so, the guidelines would not provide for enhancement based on an abuse of trust, as use of the enhancement would lead to double counting.

The FCPA does not require an individual to possess special skills to be culpable under the Act. The Application Notes to § 3B1.3 define "special skill" as a "skill not possessed by members of the general public and usually requiring

---

[122]  Id.

[123]  United States v. Sudeen, 434 F.3d 384, 391-92 (5th Cir. 2005).

[124]  Id. at 391.

[125]  Id. (citing United States v. Hussey, 254 F.3d 428, 431 (2d Cir. 2001)).

substantial education, training, or licensing."  The FCPA contains no such requirements; it applies to "any officer, director, employee, or agent" of an issuer or "any stockholder thereof acting on behalf of such issuer,"[126] whose actions fall under the remaining elements of the Act.  Nor does the Act require a defendant to commit an abuse of trust.

Although we have not yet addressed an abuse of trust enhancement under the FCPA, we have found in fraud and embezzlement cases that the base offense does not include an abuse of trust but rather a lesser standard of breach of trust.[127]  We have also upheld abuse of trust enhancements in money laundering cases, finding that the conduct that led to the conviction under the base offense did not "itself . . . include any abuse of trust."[128]  Like fraud, embezzlement, and money laundering offenses, Murphy's actions that led to his FCPA conviction – falsely reporting import quantities and bribing foreign officials to accept false reports – were not themselves an abuse of trust as defined by § 3B1.3.

---

[126]  15 U.S.C. § 78dd-1(a).

[127]  See United States v. Buck, 324 F.3d 786, 792-93 (5th Cir. 2003) (discussing cases where the Fifth Circuit has affirmed abuse of trust enhancements in fraud sentences, and determining that "3B1.3 may apply to embezzlement convictions"). Under fraud and embezzlement, the court should distinguish "between the breach of trust necessary . . . and more egregious conduct and discretion necessary to trigger an abuse of trust enhancement." Id. at 793.

[128]  United States v. Powers, 168 F.3d 741, 751 (5th Cir. 1999).

Therefore, a sentence enhancement under § 3B1.3 is not "double counting" in this context.

Under the two-prong test for abuse of trust under § 3B1.3, Murphy occupied a position of trust with respect to the Haitian government. Murphy errs in arguing that the abuse of trust enhancement only applies when a defendant abuses "a position of trust vis-à-vis the victim of the crime." As we noted in Buck: "We have never held . . . nor do the guidelines explicitly require, that the determination whether a defendant occupied a position of trust must be assessed from the perspective of the victim."[129] In that case, we upheld the defendant's sentence enhancement because she violated her position of trust with respect to the government.[130]

We have also applied § 3B1.3 enhancements where the defendant's position of trust did not apply to the main victims of the crime, but rather to collateral victims. In Sidhu, we affirmed a doctor's conviction for defrauding the government and insurance companies by mis-reporting patient services and over-billing patients. The doctor had a position of trust with respect to the patients, yet the lower court based his conviction on government and insurance

---

[129] Buck, 324 F.3d at 794.

[130] Id. at 795.

54

company fraud.[131] We have interpreted Sidhu to permit enhancement under § 3B1.3 "whenever any victim of a criminal scheme placed the defendant in a position of trust that significantly facilitated the crime."[132] Here, Murphy, as the president and CEO of ARI, maintained a position of trust with respect to the Haitian government as well as ARI's shareholders. Even if the shareholders are not primary victims of the crime charged, Murphy harmed shareholders by conducting illegal foreign activities on behalf of the corporation.

Murphy, in occupying a position of trust, maintained a position superior to that of all other individuals with a similar ability to commit or conceal offenses. As a leader within the corporation, the record shows that Murphy authorized employees to pay "commissions" (bribes) to Haitian officials to induce these officials to accept underreported quantities of rice imports.[133] In doing so, Murphy "significantly facilitated the commission" of the FCPA offense. The district court therefore committed no error in applying the § 3B1.3 enhancement

---

[131] United States v. Sidhu, 130 F.3d 644, 647, 655-56 (5th Cir. 1997).

[132] Buck, 324 F.3d at 795 (emphasis added).

[133] See, e.g., Government Exhibit 82, E-mail from Douglas Murphy to ARI employees and David Kay (Dec. 29, 1998) (approving a $40,000 commissions payment to Haitian officials); Testimony of Lawrence Theriot (describing conversations with Kay and Murphy regarding ways to "shrink" the cargo and reduce tax payments under "Plan B").

for abuse of a trust position to Murphy's sentence, and we AFFIRM the sentencing enhancement.

X

We AFFIRM conviction of Defendants on all counts.