**Opinion issued June 25, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-11-00201-CV

_____

**ROBERT WRITT, Appellant**

**V.**

**SHELL OIL COMPANY AND SHELL INTERNATIONAL, E&P, INC.,**
**Appellees**

On Appeal from the 189th District Court
Harris County, Texas
Trial Court Cause No. 2009-65221

# O P I N I O N

Appellant, Robert Writt, challenges the trial court's rendition of summary

judgment in favor of appellees, Shell Oil Company and Shell International, E&P,

Inc. (collectively, "Shell"), in Writt's suit against Shell for defamation. In two issues, Writt contends that the trial court erred in granting Shell summary judgment as Shell did not have an "absolute privilege," or "immunity," to make defamatory statements about him to the United States Department of Justice ("DOJ"), he presented evidence of the damages caused by Shell's defamation, and damages are presumed as a matter of law on his claim for defamation per se.[1]

## Introduction

Because the absolute privilege could possibly be used improperly as a sword, rather than properly as a shield, Texas courts and the Restatement of the Law on Torts have long distinguished between it, for communications made during judicial and quasi-judicial proceedings, and the qualified, or conditional, privilege, for communications made in the public interest.[2] To extend the absolute privilege to the circumstances of the instant case, where neither Shell nor Writt was a party to an ongoing or proposed judicial or quasi-judicial proceeding at the time that Shell made the complained-of statements, would have the very dangerous effect of

---

[1] Shell has filed a motion for en banc reconsideration. *See* TEX. R. APP. P. 49.7. The panel withdraws its February 14, 2013 opinions and substitutes these opinions in their place.

[2] *See, e.g., Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 768 (Tex. 1987); RESTATEMENT (SECOND) OF TORTS §§ 585–591 (1977) (discussing application of absolute privilege); *id.* § 598 (discussing application of qualified, or conditional, privilege).

actually discouraging parties from being truthful with law-enforcement agencies and instead encourage them to deflect blame to others without fear of consequence.

The "immunity" conferred by the absolute privilege attaches only to a "select number of situations which involve the administration of the functions of the branches of government, such as statements made during legislative and judicial proceedings."[3] And a defendant is entitled to summary judgment on the basis of the absolute privilege only if the evidence conclusively proves the privilege's application.[4]

Here, as detailed below, Shell presented summary-judgment evidence that the DOJ requested a forty-five minute meeting with Shell to discuss its business dealings with another company. And, during the meeting, Shell, according to the DOJ, agreed to "voluntarily investigate its business dealings" with the company and provide the DOJ with certain documents and Shell's "proposed investigative plan." Eighteen months later, Shell provided its investigative report, which contains the complained-of statements about Writt, to the DOJ. As noted by Shell, it was not until twenty months after it had given the investigative report to the DOJ that the DOJ first "open[ed] a judicial proceeding and file[d] a criminal information" against Shell. There simply is no evidence that

---

[3] *Hurlbut*, 749 S.W.2d at 768.

[4] *Id*.

a criminal case had been filed against Writt or Shell, or that a criminal prosecution was actually being proposed against either Writt or Shell, at either the time the DOJ first contacted Shell or when Shell submitted its report to the DOJ. Thus, we conclude that the summary-judgment evidence does not conclusively establish the applicability of the absolute privilege to the complained-of statements made by Shell in its voluntarily-made investigative report to the DOJ.[5]

However, given that a "sufficiently important public interest" may have "require[d]" that Shell make the communication to the DOJ, whether solicited by the DOJ or not, "to take action if the defamatory matter [were] true," we conclude that Shell enjoys the adequate protection of the conditional privilege as a "Communication to One Who May Act in the Public Interest."[6] As noted below, the conditional privilege is "applicable when any recognized interest of the public is in danger, *including the interest in the prevention of crime and the apprehension of criminals*, the interest in the honest discharge of their duties by public officers, and the interest in obtaining legislative relief from socially recognized evils."[7]

---

[5] *See id.*

[6] *See* RESTATEMENT (SECOND) OF TORTS § 598 (1977).

[7] *Id*. § 598 cmt. d (emphasis added).

Accordingly, we reverse the judgment of the trial court and remand for proceedings consistent with this opinion.[8]

## Background

In his petition, Writt alleges that, as an employee of Shell, he was charged with the responsibility of approving payments to contractors on certain Shell projects in foreign countries, including Nigeria. During the course of his work, Writt learned that certain Shell contractors were under investigation "by various governmental agencies" for making and receiving illegal payments and one of Shell's vendors had pleaded guilty to violating the Foreign Corrupt Practices Act ("FCPA").[9] Writt further alleged that, in response to an informal inquiry to Shell from the DOJ, Shell had "voluntarily" submitted to the DOJ a report in which Shell "falsely accused him" of "engaging in unethical conduct" in connection with the

---

[8] Shell also sought summary judgment on Writt's defamation claim on the ground that Writt presented no evidence of his damages. However, after Shell filed its summary-judgment motion, Writt amended his petition to include a claim for defamation per se. Shell did not file an additional or amended summary-judgment motion to attack Writt's defamation per se claim or the alleged damages arising therefrom. As Shell recognizes in its appellees' brief, damages for a claim for defamation per se are presumed as a matter of law. *See Knox v. Taylor*, 992 S.W.2d 40, 60 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("In the recovery on a claim of defamation per se, the law presumes actual damages and no independent proof of damages to reputation or of mental anguish is required."). Because Writt amended his petition after Shell filed its summary-judgment motion and Shell did not separately attack the damages element of Writt's defamation per se claim, Shell, as stated in its appellees' brief, has not addressed the damages issue on appeal.

[9] *See* 15 U.S.C. § 78dd-1 (2004).

payment of "bribes" and providing inconsistent statements during multiple interviews conducted by Shell as part of its internal investigation. Writt asserted a claim for defamation[10] against Shell for the allegedly false statements contained in its report to the DOJ. Specifically, Writt alleged that Shell, in its report, falsely stated that he had been involved in illegal conduct in a Shell Nigerian project by recommending that Shell reimburse contractor payments he knew to be bribes and failing to report illegal contractor conduct of which he was aware.

In its summary-judgment motion, Shell argued that because the statements made in its report to the DOJ were "absolutely privileged," they could not give rise to a defamation claim. Shell asserted that federal regulations authorize the DOJ to prosecute violations of the FCPA,[11] it "agreed with the DOJ to undertake the internal investigation," it furnished the report to the DOJ "with the understanding that the facts in the report would be used by the DOJ in determining whether or not to prosecute Shell for FCPA violations," and the report related to the DOJ investigation.

---

[10] Writt also asserted a claim against Shell for wrongful termination of his employment, but Writt has not appealed the trial court's adverse judgment entered on the claim after a jury trial.

[11] *See* 28 C.F.R. § 0.55(m)(4) (assigning enforcement of FCPA to Assistant Attorney General, Criminal Division of DOJ).

In support of its summary-judgment motion, Shell attached a copy of a July 3, 2007 letter from Mark Mendelsohn of the Fraud Section of the DOJ's Criminal Division to Shell. In his letter, Mendelsohn stated in pertinent part:

> It has come to our attention that [Shell] has engaged the services of Panalpina, Inc. ("Panalpina")[12] to provide freight forwarding and other services in the United States and abroad, and that certain of those services may violate the [FCPA]. *The purpose of this letter is to request a meeting with you to further discuss Shell's engagement of Panalpina.* We anticipate this initial meeting *will not take longer than 45 minutes*.

(Emphasis added.) Mendelsohn also made a "request" that, in advance of the meeting, Shell "prepare and provide the Fraud Section a spreadsheet detailing in what countries Shell has used the services of Panalpina" and "the total amount of payments for such services for the past five years."

Shell also attached to its motion the affidavit of Michael Fredette, Shell's Managing Counsel, who testified that, after receiving Mendelsohn's letter, Shell representatives met with the DOJ and Shell "agreed to conduct *an internal investigation* into its dealings with Panalpina." (Emphasis added.) Fredette further testified:

> I was one of the leaders of *Shell's internal investigation*. The investigative team was comprised of members of the Shell Legal Department and Shell's Business Integrity Department, and assisted

---

[12] The record reflects that the DOJ had been investigating Panalpina for a significant period of time prior to contacting Shell. The record also reflects that in February 2007, Shell's contractor, Vetco Gray, pleaded guilty to violating the FCPA in connection with payments made through Panalpina.

by outside counsel from Vinson & Elkins LLP and forensic accountants from KPMG LLP.

Shell's Business Integrity Department is staffed with attorneys and former law enforcement officers, including former Federal Bureau of Investigation agents.

The *internal investigation* began in August 2007, *and culminated in a written report submitted to the [DOJ] on or about February 5, 2009.* Shell submitted the report to the [DOJ] with the understanding that the report would be treated confidentially.

Shell agreed to conduct the *internal investigation* with the understanding that *it would ultimately report its finding to the [DOJ] and that the [DOJ] would conduct its own investigation for possible violations of the [FCPA] and other laws by Shell and/or its employees.*

(Emphasis added.)

Additionally, Shell attached to its summary-judgment motion a July 17, 2007 letter from Stacey K. Luck of the DOJ's Fraud Section to Shell's legal counsel, C. Michael Buxton of Vinson & Elkins LLP. In the letter, Luck stated in pertinent part:

Thank you and your client, [Shell], for meeting with us today. As discussed, *it is our understanding that Shell intends to voluntarily investigate its business dealings* with Panapina Inc. and all other Panalpina subsidiaries and affiliates (collectively referred to as "Panalpina").

(Emphasis added.) Luck requested that "in conducting the investigation," Shell produce certain documents and information pertaining to the time period of June 2002 through June 2007. Luck also specifically requested that "[p]rior to initiating your investigation" and the production of any documents, Shell provide the current

8

location of a number of individuals, including Writt, who had been associated with a Shell project in Nigeria from January 1, 2004 to December 31, 2005. And Luck requested Shell's "proposed investigative plan," including the "estimated volume of documents implicated," "number of individuals to be interviewed," and "proposed duration of the investigation."

Finally, we note that Shell also attached to its motion, among other documents, a copy of a September 4, 2008 Vinson & Elkins memorandum regarding an "Overview on Robert Writt" and the February 5, 2009 investigative report that Shell had provided to the DOJ. In the report submitted to the DOJ, Shell set forth the basic background facts of the investigation, explained that the DOJ had contacted Shell and met with its representatives regarding allegations of criminal violations, and noted that Shell had "agreed to conduct an internal investigation" and "work with the DOJ to establish an investigative plan." It also noted that the DOJ had requested that Shell "produce ten categories of documents and other information in connection with its investigation." Shell then made findings and recommendations to deter future "potential violations" of Shell's business principles, recommended disciplinary action for "certain staff," and noted that the "investigation team" had identified "certain individuals to the relevant Shell managers for consequence management." Shell also included in the report specific references to Writt, discussed his conduct in relation to Shell's dealings

9

with its contractors, and detailed the information that Writt had provided during Shell's investigation.

In his response to Shell's summary-judgment motion, Writt asserted that Shell, in its report to the DOJ, had falsely described him as a major participant in illegal conduct. Citing Shell's report, Writt noted that he had informed Shell that he had suspected certain illegal activity and had objected to Shell reimbursing certain vendors for illegal payments. Nevertheless, Shell informed the DOJ that Writt had approved payment of certain bribes, had denied suspecting that bribery was occurring, and had failed to take action to stop the bribery on seventeen separate occasions. Further citing Shell's report to the DOJ, Writt also complained that Shell informed the DOJ that he had provided inconsistent statements during his interviews. Writt argued that because, under Texas law, "[s]tatements made to prosecutorial agencies like the DOJ receive at most a qualified privilege," Shell was not entitled to summary judgment on the ground that it enjoyed an "absolute privilege" to make the statements. In addition to the report, Writt attached to his response his deposition and affidavit testimony. In his testimony, Writt explained that he had been suspicious of certain payments made by a Shell contractor beginning in 2004, he subsequently learned that one of Shell's contractors had pleaded guilty in February 2007 to FCPA violations, and he had notified Shell

10

personnel about an internal investigation being conducted by the contractor and the contractor's subsequent guilty plea to FCPA violations.

In its reply, Shell noted that on November 4, 2010, twenty months after it had provided its investigative report to the DOJ, the DOJ "open[ed] a judicial proceeding and file[d] a criminal information [against Shell] based at least in part on the information provided by Shell in the course of the investigation." Shell then entered into a Deferred Prosecution Agreement with the DOJ, and it attached a copy of the agreement to its reply. In the agreement, the DOJ noted that Shell had cooperated in its investigation and agreed to continue cooperating in any ongoing investigation. Shell also agreed to the payment of a monetary penalty.

### Standard of Review

To prevail on a summary-judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and there is no genuine issue of material fact. TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). When a defendant moves for summary judgment, it must either (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey*, 900 S.W.2d at 341. When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon v.*

11

*Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). Every reasonable inference must be indulged in favor of the non-movant and any doubts must be resolved in his favor. *Id.* at 549.

Here, the parties dispute whether Shell's claim of absolute privilege is properly characterized as a defense or an affirmative defense for which Shell had the burden of proof. *Compare Clark v. Jenkins*, 248 S.W.3d 418, 433 (Tex. App.—Amarillo 2008, pet. denied) (stating that absolute privilege is "affirmative defense to be proved"), *with CEDA Corp. v. City of Houston*, 817 S.W.2d 846, 849 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (citing *Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 913 (Tex. 1942)) (stating that "absolute privilege is not a defense" and that "absolutely privileged communications are not actionable."). Regardless of the different characterizations of the absolute privilege in Texas, a defendant is entitled to summary judgment on the basis of absolute privilege only if the evidence conclusively proves the privilege's application. *See Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 768 (Tex. 1987) (holding that evidence did not conclusively establish application of absolute privilege); *see also Thomas v. Bracey*, 940 S.W.2d 340, 343 (Tex. App.—San Antonio 1997, no writ) ("Whether an alleged defamatory matter is related to a proposed or existing judicial proceeding is a question of law to be determined by the court.").

## Absolute Privilege

In his first issue, Writt argues that the trial court erred in granting summary judgment in favor of Shell because Shell did not have an absolute privilege to make defamatory statements about him in its report to the DOJ. Writt asserts that there is "no summary judgment evidence that the DOJ had initiated any legal proceedings against Shell" at the time that it made the defamatory statements in its report.

"An absolutely privileged communication is one for which, by reason of the occasion upon which it was made, no remedy exists in a civil action for libel or slander." *Reagan*, 166 S.W.2d at 912. When the absolute privilege applies to a communication, there is no action in damages, "and this is true even though the language is false and uttered or published with express malice." *Id*.; *see also Hurlbut*, 749 S.W.2d at 768 (stating that when absolute privilege applies, "the actor's motivation is irrelevant" and privilege is "not conditioned upon the honest and reasonable belief that the defamatory matter is true or upon the absence of ill will on the part of the actor"). Thus, the absolute privilege may be properly characterized "as an immunity." *Hurlbut*, 749 S.W.2d at 768.

The absolute privilege, or immunity, is "based chiefly upon a recognition of the necessity that certain persons, because of their special position or status, should be as free as possible from fear that their actions in that position might have an

adverse effect upon their own personal interests." RESTATEMENT (SECOND) OF TORTS ch. 25, title B, intro. note (1977). To accomplish this end, "it is necessary for them to be protected not only from civil liability but also from the danger of even an unsuccessful civil action." *Id*. Under the Restatement, these persons include "Judicial Officers," "Attorneys at Law," "Parties to Judicial Proceedings," "*Witnesses in Judicial Proceedings*," "Jurors," "Legislators," "*Witnesses in Legislative Proceedings*," and "Executive and Administrative Officers." *Id*. §§ 585–591 (emphasis added).

In contrast, the "qualified," or "conditional," privilege concerning communications may be defeated when it is abused, i.e., when the "person making the defamatory statement knows the matter to be false or does not act for the purpose of protecting the interest for which the privilege exists." *Hurlbut*, 749 S.W.2d at 768. The distinction between the absolute privilege and the conditional, or qualified, privilege is that "an absolute privilege confers immunity regardless of motive whereas a conditional privilege may be lost if the actions of the defendant are motivated by malice." *Id*.

The conditional privilege "*arises[s] out of the particular occasion* upon which the defamation is published" and is "based upon a public policy that recognizes that it is desirable that *true information* be given whenever it is reasonably necessary for the protection of the actor's own interests, the interests of

14

a third person, or *certain interests of the public*." R<span style="font-variant:small-caps">ESTATEMENT</span> (S<span style="font-variant:small-caps">ECOND</span>) <span style="font-variant:small-caps">OF</span>

T<span style="font-variant:small-caps">ORTS</span> ch. 25, title B, intro. note (emphasis added). As noted in the Restatement:

> In order that this information may be freely given it is necessary to protect from liability those who, for the purpose of furthering the interest in question, give information which, without their knowledge or reckless disregard as to its falsity, is in fact untrue.

*Id.* The conditional privilege, which protects an actor from liability, but not civil action, for providing information the actor believes to be true applies to a "Communication to One Who May Act in the Public Interest." *Id.* at § 598.

Texas recognizes that the "immunity" conferred by the absolute privilege attaches only to a "select number of situations which involve the administration of the functions of the branches of government, such as statements made during legislative and judicial proceedings." *Hurlbut*, 749 S.W.2d at 768. The Texas Supreme Court has explained that communications made "in the due course of a judicial proceeding" are absolutely privileged, and this privilege "extends to any statement made by the judge, jurors, counsel, parties or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case." *James v. Brown*, 637 S.W.2d 914, 916–17 (Tex. 1982). Additionally, the application of the absolute privilege to communications made in the course of judicial proceedings has been extended to apply "to proceedings before executive

15

officers, and boards and commissions which exercise quasi-judicial powers."[13]

*Reagan*, 166 S.W.2d at 912.  However, "[a]ll communications to public officials

---

[13]  Our dissenting colleague would have this Court be the first appellate court in the nation to characterize the DOJ as acting in a quasi-judicial capacity by engaging in its law-enforcement duties.  He would further hold that the DOJ initiated its own "quasi-judicial proceeding" simply by approaching and communicating about a potential criminal matter with Shell.  Here, as noted by Shell, the DOJ ultimately did "open a judicial proceeding and file a criminal information" against Shell, and Shell then entered into a Deferred Prosecution Agreement with the DOJ.  It seems rather odd to characterize the DOJ as engaging in a "quasi-judicial proceeding" for its prosecutorial actions taken prior to its opening of an actual judicial proceeding against Shell by the filing of a criminal information against Shell.  Such a characterization fails to recognize the distinct role of prosecutors and judges in our criminal justice system.  Regardless, our colleague would rely upon such a characterization to extend absolute immunity for communications made to the DOJ by a potential witness and/or a potential criminal defendant preliminary to an actual judicial proceeding.

In support of his position, our dissenting colleague asserts that the DOJ "satisfies most of the elements of quasi-judicial power," citing *Parker v. Holbrook*, 647 S.W.2d 692 (Tex. App.—Houston [1st Dist.] 1982, writ ref'd n.r.e.).

However, this Court in *Parker* did not, as suggested by our colleague, broadly articulate a test for determining whether any "governmental entity" exercising certain powers functions in a quasi-judicial capacity.  Rather, emphasizing that "the class of absolute privileges has traditionally *been very limited*," we noted that although, "[o]riginally, only those proceedings that were of a judicial nature were deemed to warrant the protection of an absolute privilege," the protection was later "expanded *to include some proceedings held before administrative agencies or commissions that were of a judicial nature* and warranted the protection."  *Id*. at 695 (emphasis added).  We then simply noted that "*[t]hese judicial powers exercised by administrative agencies* have been described as quasi-judicial powers, encompassing the notion that they are exercised by non-judicial agencies."  *Id*. (emphasis added).  Given this context, we then explained that,

> At least six powers have been delineated as comprising the judicial function and would be indicative of *whether a commission was acting in a quasi-judicial, or merely an administrative, capacity*: 1) the power to exercise judgment and discretion; 2) the power to hear and determine or to ascertain facts and decide; 3) the power to make binding orders and judgments; 4) the power to affect the personal or

16

are not absolutely privileged." *Hurlbut*, 749 S.W.2d at 768 (citing *Zarate v.*

*Cortinas*, 553 S.W.2d 652 (Tex. Civ. App.—Corpus Christi 1977, no writ)).

---

property rights of private persons; 5) the power to examine witnesses, to compel the attendance of witnesses, and to hear the litigation of issues on a hearing; and 6) the power to enforce decisions or impose penalties.

*Id*. (emphasis added). We concluded that "[a]n administrative agency need not have all of the above powers to be considered quasi-judicial, but certainly the more of these powers it has, the more clearly is it quasi-judicial in the exercise of its powers." *Id*. And we ultimately held that a hearing conducted by the executive committee of the Houston-Galveston Area Council, a regional planning agency of the state designated by the governor, was "not quasi-judicial in nature." *Id*. at 696.

This Court in *Parker* did not, and it has never, intimated that the protection of the absolute privilege extends to communications made to any governmental entity other than an administrative agency or commission, and then only in proceedings of a judicial nature. Indeed, a review of the reasons supporting both the absolute privilege and the conditional privilege reveals that there is no sound public policy reason to extend the absolute privilege to communications other than those made in a proceeding of a judicial nature held before administrative agencies or commissions. Because they are in basically the same position, it makes sense to recognize that a witness appearing in a proceeding of a judicial nature in front of an administrative agency or commission should be protected from a lawsuit as is a witness in a judicial proceeding. However, it makes no sense to grant the same absolute immunity from a lawsuit for communications made by an individual or an entity that may or may not be a witness some day in the future, especially if that individual or entity may or may not be a criminal defendant. To grant such an individual or entity—one that has a strong motive to deflect blame—immunity would more effectively discourage, rather than encourage, truth-telling, especially in a law-enforcement context.

As revealed below, the communication made by Shell to the DOJ regarding Writt was in the nature of a "Communication to One Who May Act in the Public Interest" under Restatement section 598. As such, given that a "sufficiently important public interest" may have "require[d]" that Shell make the communication to the DOJ, whether solicited by the DOJ or not, "to take action if the defamatory matter [were] true," Shell enjoys the adequate protection of the conditional privilege, not absolute immunity. *See* RESTATEMENT (SECOND) OF TORTS § 598.

17

In defining the scope of communications to which the absolute privilege applies, the Texas Supreme Court has referred to relevant provisions in the Restatement (Second) of Torts. *Id*. (citing RESTATEMENT (SECOND) OF TORTS §§ 583–612 (1977)). For example, in *James*, the court considered the appropriate privilege to apply to a psychiatrist's statements referenced in reports that were filed with a probate court. 637 S.W.2d at 917. The court considered the application of Restatement section 588, entitled "Witnesses in Judicial Proceedings," which provides:

> A witness is *absolutely privileged* to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as a part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding.

*James*, 637 S.W.2d at 917 (quoting RESTATEMENT (SECOND) OF TORTS § 588 (1981)) (emphasis added). Noting that the "administration of justice requires full disclosure from witnesses, unhampered by fear of retaliatory suits for defamation," the court held that the absolute privilege applied to the psychiatrist's reports as well as a letter written by an attorney in the case that was deemed written "in contemplation" of the judicial proceeding. *Id*.

More recently, the supreme court considered the appropriate privilege to apply to statements made by an insurance agency's representative to an assistant attorney general who had been assigned to investigate a group health insurance program being sold by the agency. *Hurlbut*, 749 S.W.2d at 768. The court

18

considered both Restatement sections 588 and 598, which is entitled "Communication to One Who May Act in the Public Interest." *Id.* at 767–78. Section 598 provides,

> An occasion makes a publication *conditionally privileged* if the circumstances induce a correct or reasonable belief that
>
> (a) there is information that affects a sufficiently important public interest, and
>
> (b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true.

RESTATEMENT (SECOND) OF TORTS § 598 (emphasis added) (quoted in *Hurlbut*, 749 S.W.2d at 768). Noting that the evidence before it did not conclusively establish that the allegedly defamatory statements were made to a public official or were made in the course of a judicial or quasi-judicial proceeding, the court held that the agency's communications to the assistant attorney general were "best analogized to the conditional privilege" set forth in section 598 and, thus, the statements were not absolutely privileged. *Hurlbut*, 749 S.W.2d at 768.

Texas courts of appeals have also addressed the application of the absolute and conditional privileges to various communications. In *Zarate*, the Corpus Christi Court of Appeals considered the appropriate privilege to apply to allegedly slanderous statements made in a criminal complaint filed with a local sheriff's office. 553 S.W.2d at 654. The court acknowledged that communications

19

published in the course of a judicial proceeding are absolutely privileged and the privilege for such statements extends to "proceedings before executive officers, boards or commissions which exercise quasi-judicial powers." *Id*. at 655. Analyzing the facts before it, the court determined that only a qualified privilege applied to communications "of alleged wrongful acts to an official authorized to protect the public from such acts." *Id*. The court acknowledged that "strong public policy consideration[s]" dictate that communications like the criminal complaint before it "be given some privilege against civil prosecution for defamation" and it is "vital to our system of criminal justice that citizens be allowed to communicate to peace officers the alleged wrongful acts of others without fear of civil action for *honest mistakes*." *Id*. (emphasis added). But the court concluded that such communications did not fall "within the traditional areas of absolutely privileged communications" recognized in Texas. *Id*. The court further noted that applying the absolute privilege under the circumstances before it "would unnecessarily deny those innocent victims of *maliciously or recklessly* filed complaints an opportunity to seek remuneration for their injury." *Id*. (emphasis added); *see also Vista Chevrolet, Inc. v. Barron*, 698 S.W.2d 435, 436 (Tex. App.—Corpus Christi 1985, no writ) (holding that only conditional privilege applied to criminal theft complaint made to law-enforcement authorities).

20

In *Clark v. Jenkins*, the Amarillo Court of Appeals considered the appropriate privilege to apply to allegedly defamatory statements made by a civil rights group accusing the plaintiff of having a criminal history in a memorandum published to a congressman and the DOJ's Civil Rights Division. 248 S.W.3d 418, 423–25 (Tex. App.—Amarillo 2008, pet. denied). The court, after reviewing Texas privilege law, noted that, "[c]learly, all communications to public officials are not absolutely privileged." *Id*. at 432 (citing *Hurlbut*, 749 S.W.2d at 768). The court explained that "[i]nitial communications 'to a public officer . . . who is authorized or privileged to take action' are subject to only a qualified privilege, not absolute immunity." *Id*. (quoting *Hurlbut*, 749 S.W.2d at 768). Moreover, the "filing of a criminal complaint is not absolutely privileged because, at that point, no judicial proceedings have been proposed and no investigating body has discovered sufficient information to present to a grand jury or file a misdemeanor complaint." *Id*. Citing both the Texas Supreme Court's opinion in *Hurlbut* and the Corpus Christi Court of Appeals's opinion in *Zarate*, the court concluded that "initial" communications "of alleged wrongful or illegal acts to an official authorized to protect the public from such acts [are] subject to a qualified privilege." *Id*. Because the defendant, who had published the memo to the DOJ, produced no evidence indicating that the DOJ "was actively contemplating, investigating, or litigating any civil rights violations" at the time of publication,

21

and because the defendant's allegations made in the memorandum "were preliminary in nature, i.e., designed to launch an investigation that might lead to legal action," the court held that the defendant's statements made to the DOJ "were not part of an executive, judicial, or quasi-judicial proceeding, and were not subject to an absolute privilege."[14]  *Id*. at 433.

In *Darrah v. Hinds*, the Fort Worth Court of Appeals considered the appropriate privilege to apply to statements made by a bank in a writ of sequestration filed with a court.  720 S.W.2d 689, 690–91 (Tex. App.—Fort Worth 1986, writ ref'd n.r.e.).  The court noted that the absolute privilege applies to communications made in the course of, or "in contemplation" of, judicial proceedings, while the qualified privilege applies to communications of wrongful acts to officials authorized to protect the public from such acts, such as criminal complaints.  *Id*. at 691.  Noting that the affidavit was filed and acted upon by the county court, the court held that the absolute privilege applied to the statements made in the writ of sequestration.  *Id*. at 691–92.

In *Smith v. Cattier*, the Dallas Court of Appeals, within the context of a jurisdictional analysis, considered whether the absolute privilege applied to

---

14     Similarly, in *San Antonio Credit Union v. O'Connor*, the San Antonio Court of Appeals held that a qualified privilege applied to statements made in a criminal complaint supplied to a district attorney.  115 S.W.3d 82, 99 (Tex. App.—San Antonio 2003, pet. denied).  The court noted that, at the time of the complaint, no judicial proceedings had been proposed.  *Id*.

22

statements made to the Federal Bureau of Investigation ("FBI") by one business associate concerning another business associate. No. 05-99-01643-CV, 2000 WL 893243, at *3–4 (Tex. App.—Dallas July 6, 2000, no pet.) (not designated for publication). The court noted that, under Texas law, "[a]bsolute immunity does not extend to unsolicited communications to law enforcement officials or initial communications to a public officer . . . authorized or privileged to take action" and, under such circumstances, "the actor is entitled to only a qualified privilege which may be lost if the defendant's actions are motivated by malice." *Id.* at *4 (citations omitted). The court concluded that because the defendant had failed to demonstrate that he was not involved in referring the plaintiff to the FBI or "instigating the investigation," and because the defendant failed to "negate" the plaintiff's claim that the defendant had "initiated, procured, and caused" the commencement of the criminal investigation into plaintiff's actions, the defendant had failed to establish that he was entitled to absolute immunity."[15] *Id.*

---

[15] More specifically, in *Smith v. Cattier*, the defendant was on the board of directors of a company that voted to terminate the plaintiff's position as the company's president and remove him and his wife from the board of directors. No. 05-99-01643-CV, 2000 WL 893243, at *3 (Tex. App.—Dallas July 6, 2000, no pet.) (not designated for publication). The board also voted to refer the plaintiff to the FBI. *Id.* Although the plaintiff was ultimately indicted, he was later acquitted and sued the defendant for slander and libel. *Id.* The defendant argued that the statements he had made to the FBI during an interview requested by the FBI in connection with its investigation were absolutely privileged. *Id.* at *4. The court rejected the defendant's absolute privilege argument, but its opinion suggests that the court did so not based upon the statements made during the course of the FBI interview, but instead upon the plaintiff's allegation that the defendant was one of the board

Finally, a federal district court in Texas recently considered the appropriate privilege to apply to allegedly defamatory statements made by a witness during Major League Baseball's ("MLB") investigation, which was conducted in conjunction with a federal investigation, into the illegal use of steroids. *See Clemens v. McNamee*, 608 F. Supp. 2d 811, 823–25 (S.D. Tex. 2009). The court noted that, under Texas law, communications "to government agencies as part of legislative, judicial, or quasi-judicial proceedings are entitled to absolute immunity so long as they are made as part of an ongoing proceeding, they are not unsolicited, and they are made to an agency whose findings need not be approved or ratified by another agency."[16] *Id*. at 823–24.

---

members that had referred him to the FBI, which the court characterized as an "unsolicited communication" that instigated the criminal investigation. *Id*.

[16] In reaching its holding, the court in *Clemens* relied significantly on *Shanks v. AlliedSignal, Inc.*, 169 F.3d 988 (5th Cir. 1999). In *Shanks*, the court held that a National Transportation and Safety Board ("NTSB") accident investigation qualified as a quasi-judicial proceeding, and, thus, Texas law recognized absolute immunity for statements made during the NTSB investigation. *Id*. at 994–95. In reaching its holding, the court engaged in a "comprehensive" review of Texas case law on the scope of the absolute privilege in the context of communications made to government agencies. *Id*. at 993–94. The court found "only two situations" in which Texas courts recognized that communications made to government agencies were not absolutely privileged: (1) cases involving "unsolicited communications to law enforcement officials" made "in advance of any formal proceeding or investigation" and (2) cases involving communications made to agencies that issue mere recommendations or preliminary findings. *Id*. at 994. The court held that the allegedly defamatory statements at issue in the case before it were "made in connection with an ongoing NTSB investigation" and were absolutely privileged. *Id*.

24

Having reviewed the Texas common law addressing the scope of the absolute privilege and its application in different factual scenarios,[17] we now turn to the arguments made by the parties in the instant case. Writt argues that only the qualified privilege applies to Shell's statements made in the report to the DOJ because there is no summary-judgment evidence that the DOJ had initiated any legal proceedings against Shell at the time it submitted the report. Writt asserts that our disposition of this case is controlled by the Texas Supreme Court's opinion in *Hurlbut*, which indicates that statements made by Shell in its report to the DOJ were not absolutely privileged. Shell counters that the absolute privilege applies to "statements solicited in an ongoing government investigation." Focusing on the *Clemens* opinion, Shell asserts that "Texas law distinguishes between statements solicited by government officials or agents as part of an ongoing investigation," to which the absolute privilege applies," and "unsolicited statements unilaterally

---

[17] This Court has not previously addressed the proper privilege to apply in circumstances similar to those presented here. In *Watson v. Kaminski*, we noted that "attorney's statements made during litigation are not actionable as defamation, regardless of negligence or malice," and the absolute privilege "includes communications made *in contemplation of and preliminary to* judicial proceedings." 51 S.W.3d 825, 827 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (emphasis added). In *Marathon Oil Co. v. Salazar*, we addressed a jury charge issue pertaining to a qualified privilege for making a criminal complaint. 682 S.W.2d 624, 629–31 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). However, we expressly stated that the defendant had not made any objection to the submission to the jury of the plaintiff's libel cause of action on the basis of absolute privilege, so we did not have the occasion to address the applicability of the proper privilege. *Id.* at 631.

25

proffered to government officials for the purpose of instigating or launching such an investigation or proceeding," to which the qualified privilege applies. Shell notes that, in preparing the report, it was under the "continuing threat of prosecution for FCPA violations" as well as the "penalty of perjury" for any misstatements contained in the report. Shell emphasizes that it was ultimately prosecuted by the DOJ for conspiracy to violate the FCPA.

We hold that the summary-judgment evidence does not conclusively establish the applicability of the absolute privilege to the complained-of statements made by Shell in the report to the DOJ. *See Hurlbut*, 749 S.W.2d at 768 (stating that defendant was entitled to summary judgment on basis of absolute privilege only if evidence conclusively proves the privilege's application). Although Shell established that it made the report in its effort to cooperate with the DOJ, Shell actually prepared the report during the course of its own voluntary "internal investigation."

Shell did present evidence that it conducted its internal investigation in response to a DOJ inquiry after attending a meeting requested by the DOJ. However, there is no evidence conclusively establishing that a criminal case had been filed against Writt or Shell, or that a criminal prosecution was actually being proposed against either Writt or Shell, at either the time the DOJ contacted Shell or when Shell submitted its report to the DOJ. The summary-judgment evidence

26

establishes that the DOJ initially contacted Shell on July 3, 2007, five months after a Shell contractor, Vetco Gray, had already pleaded guilty to violating the FCPA in connection with payments made through Panalpina. And Shell submitted the complained-of report to the DOJ on February 5, 2009. The DOJ did not, in Shell's words, "open a judicial proceeding and file a criminal complaint" against Shell until November 4, 2010, twenty months after Shell submitted its report. Just because the DOJ ultimately filed a judicial proceeding against Shell does not establish that it was proposing that one be filed when it contacted Shell on July 3, 2007 or received Shell's report on February 5, 2009.

Moreover, the report itself indicates that Shell also prepared it for important internal purposes. For example, Shell included in the report its findings and recommendations made to deter future "potential violations" of Shell's business principles, it recommended disciplinary action for "certain staff," and it stated that the "certain individuals" had been "identified" for "consequence management" by Shell. In its report, Shell was not proposing that either it or Writt should be prosecuted for a crime.[18]

---

[18]    Section 587 of the Restatement (Second) of Torts, entitled "Parties to Judicial Proceedings," provides:

> A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another *in communications preliminary to a proposed judicial proceeding*, or in the institution of or during the

Our conclusion that the absolute privilege does not apply to the statements made by Shell to the DOJ is based upon our review of Texas case law, which reveals that allegedly defamatory statements contained within criminal complaints, and other similar information provided by private parties to prosecutorial and law enforcement agencies prior to the initiation of criminal proceedings, are not subject to the absolute privilege. *See Clark*, 248 S.W.3d at 427–34; *Zarate*, 553 S.W.2d at 654. These holdings comport with the general recognition that the absolute privilege applies only to communications made in judicial proceedings and those communications made preliminary to or in serious contemplation of a judicial proceeding. *See Hurlbut*, 749 S.W.2d at 767 (citing RESTATEMENT (SECOND) OF TORTS § 588); *James*, 637 S.W.3d at 917; *Zarate*, 553 S.W.2d at 654; *see also San Antonio Credit Union*, 115 S.W.3d at 99 (stating that "an investigation into criminal activity does not amount to" proposed judicial proceeding and proposed judicial proceeding exists when investigating body finds "enough information

course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.

RESTATEMENT (SECOND) OF TORTS § 587 (1977) (emphasis added). Section 587 "applies to a litigant in a civil action, a defendant in a criminal prosecution, or one who, as private prosecutor, formally initiates a criminal action or applies for a search warrant by a written complaint under oath, made to the proper officer, charging another with crime." *Id.* § 587 cmt. b. It also "applies to communications made by a client to his attorney with respect to proposed litigation as well as to information given and informal complaints made to a prosecuting attorney or other proper officer preliminary to a proposed criminal prosecution whether or not the information is followed by a formal complaint or affidavit." *Id.*

28

either to present that information to a grand jury or to file a misdemeanor complaint").

In *Hurlbut*, a client of an insurance agency contacted an agent of the agency and the office of the Texas Attorney General after becoming concerned that the agency could not produce a copy of a master policy that the agency was selling. 749 S.W.2d at 764. The agent, after receiving this telephone call, then contacted the agency to inquire about the policy. *Id.* A representative of the agency reassured him and suggested he meet with the agency to "straighten out the matter." *Id.* When two insurance agents arrived at this purported meeting to straighten things out, they were "surprised by the appearance" of an assistant attorney general who had been "assigned to investigate" the insurance policy being sold by the agency. *Id.* At the meeting, an agency representative told the assistant attorney general that its employed agents did not have the authority to write the insurance policy that they were writing. *Id.* Thus, the agency effectively accused the agents of wrongdoing. The agents then accompanied the assistant attorney general to a local office and "cooperated in the investigation." *Id.* The Texas Supreme Court explained that the allegedly defamatory statements made by the agency representative at the meeting with the insurance agents were "best analogized" to the circumstances in which a conditional privilege applied. *Id.* at 768; *see also Gulf Atl. Life Ins. Co. v. Hurlbut*, 696 S.W.2d 83, 89–90 (Tex.

29

App.—Dallas 1985), *rev'd*, 749 S.W.2d 762 (providing additional factual background and indicating that agency representative had originally, falsely informed a city attorney that the agents were not authorized to write the insurance policy and a city attorney had then reported this information to the office of the Texas Attorney General).[19]

---

[19] The parties have submitted to this Court, pursuant to our request at oral argument, their survey of cases from other jurisdictions addressing the application of the absolute and qualified privileges to certain statements. Although the parties vigorously disagree about a "majority" and "minority" rule concerning the application of the absolute privilege, they have provided us with a thorough and helpful examination of other jurisdictions' treatment of the privilege issue. The surveys reflect that other jurisdictions have formulated privilege rules based, in large part, upon public policy considerations. For example, in his post-submission brief, Writt cites a case from the Connecticut Supreme Court holding that, under Connecticut law, allegedly false and malicious statements made to a law enforcement officer investigating a criminal allegation are qualifiedly, rather than absolutely, privileged. *See Gallo v. Barile*, 935 A.2d 103, 114 (Conn. 2007). The court in *Gallo* discussed policy considerations for adopting its rule, noting that a "qualified privilege is sufficiently protective of [those] wishing to report events concerning crime" and "[t]here is no benefit to society or the administration of justice in protecting those who make intentionally false and malicious defamatory statements to the police." *Id.* at 108–14.

In contrast, in its post-submission brief, Shell cites, among others, a case from the Massachusetts Supreme Court holding that, under its state's law, statements made to police or prosecutors prior to trial are absolutely privileged if they are made in the context of a proposed judicial proceeding. *Correllas v. Viveiros*, 572 N.E.2d 7, 11 (Mass. 1991). The court in *Correllas* also discussed policy considerations supporting its rule, noting that a conditional or qualified privilege would "not adequately protect a witness or party because he or she may still have to go to court to prove the absence of malice or recklessness." *Id.* Although we have considered the surveys in which the jurisdictions discuss the various policy considerations supporting their respective rules, we base our holding upon what we consider to be the rule suggested by the weight of authority in Texas. We conclude that this authority indicates that, under Texas law, it is more appropriate

Again, here, although the record establishes that the DOJ contacted Shell to discuss Shell's engagement of Panalpina in Nigeria, there is nothing in the record that conclusively establishes that, at that time, the DOJ had filed a criminal proceeding against either Shell or Writt. Nor is there any summary-judgment evidence conclusively establishing that the DOJ, at the time that it contacted Shell, was acting in a manner preliminary to filing a criminal proceeding against either Shell or Writt. Similarly, Shell has not conclusively established that it actually contemplated in good faith and took under serious consideration the possibility of a judicial proceeding. And there is no evidence conclusively establishing that Writt, prior to Shell sharing its report with the DOJ, had been implicated in the alleged commission of a crime or reported to a law-enforcement agency for an alleged criminal act. Thus, the statements in Shell's report, at least as they pertained to Writt, were more in the nature of information provided by a private party to a prosecutorial agency implicating another in wrongful conduct. And, as noted above, Texas courts have indicated that a conditional privilege is more suitable to protect such statements.[20]

---

to apply the conditional privilege to the complained-of statements made by Shell in the report that it submitted to the DOJ.

[20] Our dissenting colleague argues that Shell should be protected by the absolute privilege because "it can face criminal liability for failure to adequately comply and cooperate with the DOJ's investigation," citing *United States v. Kay*, 513 F.3d 432, 454–55 (5th Cir. 2007). In *Kay*, the defendant was charged with obstruction

31

Under the Restatement, Shell's communication is protected by the conditional privilege as a "Communication to One Who May Act in the Public Interest." *See* RESTATEMENT (SECOND) OF TORTS § 598. As such, given that a "sufficiently important public interest" may have "require[d]" that Shell make the communication to the DOJ, whether solicited by the DOJ or not, "to take action if the defamatory matter [were] true," Shell enjoys the adequate protection of the conditional privilege, not immunity.[21] *See id.* Section 598 is "applicable when any recognized interest of the public is in danger, *including the interest in the prevention of crime and the apprehension of criminals*, the interest in the honest discharge of their duties by public officers, and the interest in obtaining legislative relief from socially recognized evils." *Id.* § 598 cmt. d (emphasis added). And section 598 is specifically "applicable to defamatory communications to public

of justice for withholding certain documents and denying certain facts in testimony given to the United States Securities and Exchange Commission ("SEC") during the SEC's investigation of violations of the FCPA. *Id.* at 454. However, in *Kay*, the defendant was actually subpoenaed as a witness to appear before the SEC, and he was directed to produce documents and provide testimony. *Id.* Here, as explained above, Shell was never subpoenaed as a witness by the DOJ, and it actually produced its report implicating Writt as part of its own "internal investigation."

[21] Under the Restatement, had Shell actually filed a "[f]ormal or informal complaint[]" with the DOJ about Writt concerning an actual "violation[] of the criminal law" by him, it would then have been entitled to the absolute privilege "under the rule stated in section 587" concerning "Parties to Judicial Proceedings." *See* RESTATEMENT (SECOND) OF TORTS § 598 cmt. e. But Shell's communication to the DOJ did not constitute a formal or informal criminal complaint against Writt, and Shell has made no attempt to characterize its communication as such.

32

officials concerning matters that affect the discharge of their duties." *Id*. § 598 cmt. e ("*Communications to Public Officials*").

And even if Shell could possibly be considered as a "witness" having made "communications preliminary to a proposed judicial proceeding," it would be entitled to the absolute privilege accorded a witness in a judicial proceeding only if its communications to the DOJ had "some relation to a proceeding that is actually contemplated in good faith and under serious consideration . . . ." *Id*. § 588 cmt. e. As emphasized in the Restatement, the "*bare possibility* that the proceeding *might be* instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered." *Id*. (emphasis added).

In support of its argument that the complained-of statements in the report that it submitted to the DOJ are absolutely privileged, Shell relies greatly upon *Clemens*, 608 F. Supp. 2d at 823–25. In *Clemens*, the court noted that the evidence before it demonstrated that the pertinent witness, Brian McNamee, had been interviewed by an Assistant United States Attorney as part of a federal investigation into the distribution of steroids. *Id*. at 824. McNamee and his counsel met with the prosecutor and agents from the FBI and the Internal Revenue Service numerous times, and McNamee had been told that his "witness status" could be reviewed if he "chose not to co-operate" and he was subject to prosecution for making false statements during these interviews. *Id*. The evidence

33

also demonstrated that the prosecutor told McNamee that speaking to the MLB Commission "was part of his co-operation with the investigation in order to maintain his witness status." *Id.* Prior to the interviews with the MLB Commission, the prosecutor told McNamee that their proffer agreement would cover the interviews and he could face prosecution for any false material statements. *Id.* McNamee agreed to these terms and participated in three interviews with the MLB Commission, the interviews were all arranged by federal agents or Assistant United States Attorneys, and prosecutors and FBI agents participated in all interviews between McNamee and the MLB Commission. *Id.* The federal district court determined that the evidence established that the investigation was an "ongoing proceeding," McNamee's statements "should be protected" "[a]s a matter of public policy," McNamee was "compelled" to make his statements to the MLB Commission "as part of a judicial proceeding," and McNamee's statements "should be treated with immunity." *Id*. at 823–25.

In the instant case, the facts established in the summary-judgment record do not demonstrate that the DOJ ever granted Shell any type of "witness status." Nor is there any evidence here of a formalized investigative process of the type engaged in by the MLB Commission with the assistance of federal prosecutors and the FBI. The *Clemens* opinion reveals that McNamee's statements to the MLB Commission were made in furtherance of its regulatory and oversight functions

34

and preliminary to a proposed criminal proceeding that was actually contemplated. Indeed, McNamee had been granted "witness status." *Id*. at 824. Moreover, to the extent that the court's opinion in *Clemens* could possibly be read as applying the absolute privilege beyond how Texas courts have applied it, we note that the *Clemens* opinion is not controlling authority on this Court. Rather, we are bound to follow the guidance and reasoning provided by the Texas Supreme Court in *Hurlbut*.

## Conclusion

In sum, the summary-judgment evidence presented in the trial court below does not conclusively establish that, at the time Shell prepared its report following its "internal investigation" and submitted it to the DOJ, a criminal judicial proceeding against either Shell or Writt was either ongoing or "actually contemplated" or under "serious consideration" by the DOJ or Shell. *See* RESTATEMENT (SECOND) OF TORTS § 588, cmt. e. Rather, the communication made by Shell in its report to the DOJ and complained of by Writt is protected by the conditional privilege as a "Communication to One Who May Act in the Public Interest." *See id.* § 598.

Accordingly, we hold that the trial court erred in granting Shell's summary-judgment motion. We sustain Writt's first issue. And we reverse the judgment of the trial court and remand for proceedings consistent with this opinion.


Terry Jennings
Justice

Panel consists of Justices Jennings, Sharp, and Brown.

Justice Brown, dissenting.